In re David A. PAIGE and Karen E. Paige, f/d/b/a Cheers Cafe, Debtors.

Jack DALPE and Robert Ciccarelli, Plaintiffs,

v.

David A. PAIGE and Karen E. Paige, f/d/b/a Cheers Cafe, Defendants.

Bankruptcy No. 5–88–00402.
Adv. No. 5–88–0087.

United States Bankruptcy Court, D. Connecticut.

Oct. 19, 1989.

---

Joseph M. Brophy, Westport, Conn., for plaintiffs.

Ira B. Charmoy, Charmoy & Kanasky, Bridgeport, Conn., for debtors.

## MEMORANDUM AND DECISION ON OBJECTION TO PROOF OF CLAIM AND COUNTERCLAIM

ALAN H.W. SHIFF, Bankruptcy Judge.

The plaintiffs, Jack Dalpe and Robert Ciccarelli, have filed a proof of claim as secured creditors to which the chapter 13 debtor-defendants, David and Karen Paige, have filed an objection and a counterclaim. The counterclaim arises out of the same sale transaction as the plaintiffs' claim. Accordingly, it is determined that this proceeding is a core proceeding. 28 U.S.C. § 157(b)(2)(C), (b)(3).

### BACKGROUND

The following facts are adduced from the testimony and exhibits offered at trial. David Paige ("Paige") had known Robert Ciccarelli on a business and social basis for five years prior to February, 1987 when he told Ciccarelli that he was dissatisfied with his employment and the subject of Paige purchasing a bar known as "Cheers" from the plaintiffs was first mentioned. There is considerable dispute as to what else was said. Paige claims that Ciccarelli told him that he could make good money, "$1,000.00 per week or better", that he told Ciccarelli that he did not have the cash to purchase Cheers, and that Ciccarelli told him that the defendants would cosign a note to finance the purchase. Paige further testified that Dalpe assured him that he would make money from the bar. Ciccarelli, on the other hand, denied that he gave Paige any assurance that he would make money if he purchased Cheers. Instead, he claims he only said that Paige could make money if he personally operated the bar and cut down on overhead.

About four weeks before the sale, Ciccarelli gave Paige books and records of cash receipts for 1985 and part of 1986. *Defendants' Exhibits* F and G. Paige did not

ask for tax returns and none were furnished until after the sale. The tax records for the years 1985 and 1986 showed losses of approximately $35,000.00 in each year. *Defendants' Exhibits* C and D. Paige engaged the services of an attorney but did not retain him to review financial records. Paige testified that he undertook to review Exhibits F and G himself rather than have an accountant analyze the financial condition and projected income of Cheers. Paige further testified that he visited Cheers once or twice before the sale. Ciccarelli stated that Paige was there for about four weeks prior to the sale and worked on several occasions.

On April 1, 1987, the plaintiffs and Paige entered into an agreement for the sale of Cheers for $60,000.00. *Plaintiffs' Exhibit 1.* Paige financed the purchase by giving a note for $60,000.00 (the "note")[1] secured by a second mortgage to Gateway Bank. The plaintiffs cosigned the note as guarantors, and the debtors gave them a third mortgage on their residence as security for any loss arising out of the guarantees. Paige paid the plaintiffs $55,000.00 out of the $60,000.00 he borrowed from Gateway Bank, and kept $5,000.00 for operating capital. He also obtained a home equity loan of approximately $20,000.00, which he claims he used for working capital, including his $700.00 per week salary.

On April 1, 1987, the plaintiffs and Paige also entered into an Escrow Agreement which provided that during the pendency of Paige's application for a liquor permit, he would operate Cheers and retain the net profits of the business. *Plaintiffs' Exhibit 2.* Paige operated Cheers from early April to the end of December, 1987. During that period his rent and note payments were intermittent.[2]

At the time of the sale, Cheers, which did most of its business as a bar, had a small lunch business. There is some dispute as to whether Paige continued opening for lunch, but the more credible testimony was from a former employee, Linda Benedict, who stated that after the first week, Paige did not open the restaurant until three in the afternoon.

College students represented a significant percentage of Cheers' clientele. The restaurant hired a number of college students as bartenders, two of whom were not rehired by Paige. A few weeks after the sale, one of the former employees came to the restaurant, stood on a bar stool, and announced that he and another student had been fired. The restaurant was thereafter unable to attract that clientele.

When Paige defaulted on the note, the plaintiffs, as guarantors, paid Gateway $64,000.00. Thus, in the final analysis, the sale of Cheers to Paige did not result in any payment to the plaintiffs. Paige abandoned Cheers in December, 1987. The restaurant was repossessed by the plaintiffs who resold it for $40,000.00 and now seek allowance of their proof of claim, filed July 11, 1989, as follows:

> $60,000.00 on a Mortgage Deed and Security Agreement.... The consideration for this debt is the sale of a restaurant known as "Cheers"....[3]

*See* 11 U.S.C. § 502(a).

The defendants have objected on the basis that:

> 2. Said claimants fraudulently misrepresented the assets, liabilities and income of said business to the debtor and therefore no monies are due and said secured claim should be disallowed.[4]

---

**1.** I cannot tell from the note, which is illegible, whether it was also signed by Karen Paige. *See Plaintiffs' Exhibit 5.*

**2.** Ciccarelli testified that as of the time Paige surrendered the restaurant in December, 1987, Paige owed Gateway Bank $64,000.00 on the note and $12,000.00 for rent, and that the plaintiffs paid those and several other obligations.

**3.** Notwithstanding the provisions of the Escrow Agreement, which provides that the plaintiffs

may recover amounts paid on business debts accrued while Paige was in possession of Cheers, *Plaintiffs' Exhibit 2,* ¶ 11, the plaintiffs' counsel stated in response to a question from the court that the plaintiffs were making no such claim despite testimony that they paid approximately $28,000.00 for rent, utilities, inventory, insurance, and taxes incurred by Paige.

**4.** Ciccarelli and Paige filed an affidavit on April 1, 1987, which stated that there were "no creditors of said business other than current ac-

3. No sale ever took place in that said Dalpe and Ciccarelli continued to manage the business by writing checks and by failing to turn over their books and records to said business until after the agreements were executed.

*Objection,* ¶¶ 2–3. *See* 11 U.S.C. § 502(b). In addition, Paige has asserted a counterclaim the principal thrust of which is also that he was fraudulently induced to purchase Cheers by the plaintiffs' intentional misrepresentations.[5]

## DISCUSSION [6]

### A. *Objection to Proof of Claim*

■ A properly filed proof of claim is prima facie evidence of the amount and validity of the claim, and a debtor who objects must offer evidence in rebuttal. The ultimate burden, however, is upon the creditor to prove the claim by a fair preponderance of the evidence. *In re Aulicino,* 48 B.R. 252, 254 (Bankr.D.Conn.1985); *Central Rubber Products, Inc. v. Stafford Higgins Indus., Inc. (In re Central Rubber Products, Inc.),* 31 B.R. 865, 867 (Bankr.D.Conn.1983).

■ Having assessed the credibility of the witnesses and reviewed the exhibits offered in evidence, I conclude that there is not one scintilla of persuasive evidence to support the defendants' objection. The defendants' allegation that the plaintiffs fraudulently misrepresented the assets of Cheers is directly contradicted by Paige's testimony that he couldn't recall any missing assets. As to allegedly misrepresented

or concealed liabilities, Paige testified that prior to the sale, he was led to believe that all outstanding taxes were to have been paid, but there was no persuasive evidence that there was in fact any tax liability at the time of the purchase. In any event, Paige has admitted that he has not paid any taxes, and there is no claim that he has any tax liability. Further, it is clear from the evidence that the plaintiffs did not fraudulently misrepresent Cheers' potential but rather stated an opinion that money could be made under certain conditions. *See infra.*

### B. *Counterclaim*

■ The material allegations of Paige's counterclaim to the effect that the plaintiffs defrauded Paige fare no better. The first count alleges common law fraud. Under Connecticut common law, the elements of fraud are: (1) a false representation was made as a statement of a material fact; (2) the representation was known to be false by the party making it; (3) the representation was made to induce the other party to act upon it to his detriment; and (4) the other party did so act and, as a result, suffered an injury. *Bailey Employment Sys., Inc. v. Hahn,* 545 F.Supp. 62, 66–67 (D.Conn.1982), *aff'd,* 723 F.2d 895 (2d Cir. 1983); *Miller v. Appleby,* 183 Conn. 51, 54–55, 438 A.2d 811 (1981).

■ Paige's claim that the plaintiffs made express misrepresentations "that the business had a positive cash flow and would make money . . . ," is defeated by the

---

counts, all of which will be paid at the time of the closing of the sale of said business to DAVID PAIGE on April 1, 1987." *Defendants' Exhibit* A.

**5.** It is that the counterclaim contains an allegation that "[s]aid agreement was conditioned upon the receipt by and approved (sic) of the Debtor of a liquor license which said liquor license was not received." *Counterclaim,* Count One, ¶ 6, Count Two, ¶ 6.

The assertion that there was an unsatisfied condition precedent would appear to belong in the Defendants' objection. In any case, Paige testified that he operated the restaurant with its existing liquor license and never paid the application fee for a license of his own. He contends that by the time it was necessary to pay the license application fee, he had decided that he no longer wanted to keep the restaurant. He

therefore abandoned efforts to obtain a liquor license notwithstanding his obligation under paragraph 12 of the Escrow Agreement that he "diligently pursue his existing application." *Plaintiffs' Exhibit* 2, ¶ 12.

**6.** Both defendants have objected to the plaintiffs' proof of claim. Although the counterclaim was drafted as though it was applicable to both defendants, no evidence was offered that Karen Paige purchased Cheers. Even if Karen Paige cosigned the note, *see supra* note 1, no claim is made that any statements were made to her by the plaintiffs regarding the purchase. I am accordingly treating the counterclaim as though it had been asserted by David Paige ("Paige") alone.

first element of that test. *Counterclaim,* Count One, ¶ 2.[7] The requirement that the representation be made as a statement of fact is intended to distinguish such statements from the mere assertion of an opinion. *Crowther v. Guidone,* 183 Conn. 464, 468, 441 A.2d 11 (1981). There can be no statement of fact as to a future event. All there can be is a prediction and while some, such as those based on scientific data or natural laws, are reliable, opinions as to how a given business will perform in the future are not. Decades of bankruptcy court experience stand as undeniable proof of that observation.

A statement that Cheers would make money if Paige made certain changes was nothing more than a prediction or an opinion. Moreover, there is no basis in the evidence to support a conclusion that the opinion was unwarranted merely because Cheers lost money in the past and then continued to lose money after the sale to Paige. On the contrary, there is ample evidence to conclude that Cheers lost money after the sale because Paige was undercapitalized and inexperienced and made critical management errors, *e.g.,* firing or failing to rehire college bartenders in a bar that catered to a college clientele.

 Paige also claims that the plaintiffs "fraudulently and intentionally withheld ... books and records", specifically the 1985 and 1986 tax returns. *Counterclaim,* Count One, ¶ 8. While the intentional withholding of information for the purpose of inducing action is the equivalent of an express or affirmative misrepresentation, *Pacelli Bros. Transp., Inc. v. Pacelli,* 189 Conn. 401, 407, 456 A.2d 325 (1983), " 'the general rule is that ... silence ... cannot give rise to an action ... to set aside the transaction as fraudulent. *Certainly this is true as to all facts which are open to discovery upon reasonable inquiry.*' " *Duksa v. City of Middletown,* 173 Conn. 124, 127, 376 A.2d 1099 (1977) (quoting *Gayne v. Smith,* 104 Conn. 650, 652, 134 A. 62 (1926)) (emphasis added). A

finding of fraud based on nondisclosure requires proof of a failure to disclose known facts coupled with a request or a duty to disclose. *Id.* A party who discloses information assumes the duty to make a full disclosure regarding the specific matters disclosed. *Id.* Paige did not specifically ask for tax returns. It is unclear what he did request. He was given records of cash receipts. *Exhibits* F and G. Cash receipts are not a disclosure of income.

Even if Paige had proven that his purchase was induced by the plaintiffs' fraudulent misrepresentations, proof that he sustained money damages as a result ranged from nonexistent to grossly inadequate. For example, his claim that he contributed his own money to the business, *Counterclaim,* Count One, ¶ 9.a, is apparently a reference to his arrangements for and a draw from a home equity loan. Aside from the naked assertion that he contributed such money, he was apparently content to provide the court with a jumble of numbers with the hope that the court would find some basis to support his claim. *Defendants' Exhibit* H. It is not, however, the responsibility of the trier of fact to search the evidence to see if there is any support for a litigant's allegations. Further, his allegation that he paid the plaintiffs, *see Counterclaim,* Count One, ¶¶ 9.b, 11, is directly contradicted by the unrefuted evidence that he borrowed the entire $60,000.00 purchase price and paid $55,000.00 of that loan to the plaintiffs. When he defaulted on the note, the plaintiffs, as guarantors, paid the bank $64,000.00, and their failure to be paid by the defendants is the basis for their claim in this proceeding.

Paige offered no evidence to support his claim that his credit was damaged and that he was caused shame and embarrassment as a result of filing a bankruptcy petition. *Counterclaim,* Count One, ¶ 10. Nor was any evidence offered so that the amount of any such damages could be measured. It is likely that he was dissatisfied with his

---

**7.** Count One also alleged that the plaintiffs "misrepresented ... the assets, liabilities and profitability of said business." *Counterclaim,* Count

One, ¶ 7. As noted, that allegation is without merit. *See supra* at p. 349.

current employment, he wanted to believe that Cheers was his way out, and his decision to buy was based upon emotion not fact. Paige may well have been embarrassed. If he was, his discomfort is traceable to a recognition that he allowed his emotions to rule his judgment.

Count Two of the counterclaim alleges that "[s]aid fraudulent misrepresentations by Dalpe and Ciccarelli constitute unfair trade practices pursuant to the Connecticut General Statutes made and provided." *Counterclaim,* Count Two, ¶ 12. Count Two, however, is silent as to the statute relied upon, and Paige has neither provided that information in his pretrial memorandum nor made any reference during the trial to a violation of any statute. Thus, the court is left to speculate that Paige may hope to recover under the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. Ann. § 42–110a *et seq.* ("CUTPA").

If CUTPA is Paige's target, it is emphasized he has left the court to address that claim in a vacuum, there having been no attempt to show that CUTPA is applicable to the facts of this proceeding under Connecticut law as established by its courts. Even if it were assumed that Paige has not abandoned a CUTPA claim, *see Allen v. Barnes Hosp.,* 721 F.2d 643, 644 (8th Cir. 1983), he has failed to prove that he is entitled to recover. Connecticut General Statutes § 42–110b(a) provides:

> No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

Connecticut General Statutes § 42–110g(a) provides:

> Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section. The court

may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.

■ As the Connecticut Supreme Court has held, "[t]he ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief." *Hinchliffe v. American Motors Corp.,* 184 Conn. 607, 615, 440 A.2d 810 (1981). *See also Conaway v. Prestia,* 191 Conn. 484, 494, 464 A.2d 847 (1983). To satisfy the "ascertainable loss" requirement, a party claiming a breach of CUTPA must prove that a purchase was made partially as a result of an unfair or deceptive act or practice *and that the item purchased was different from what was bargained for. Hinchliffe, supra,* 184 Conn. at 614–15, 440 A.2d 810. Paige presented no evidence that he did not get what he bargained for. As noted, he was given the opinion that he could make money if he made certain changes at Cheers, and that has not been shown to be untrue.

## CONCLUSION

Judgment may enter in favor of the plaintiffs on their claim and against Paige on his counterclaim, but since the claim is premised on the failure of the plaintiffs to be paid for the sale of Cheers, it is necessary to deduct the $40,000.00 they have received on the resale of the restaurant. *Beckman v. Jalich Homes, Inc.,* 190 Conn. 299, 309, 460 A.2d 488 (1983) ("The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed."). The plaintiffs' claim is accordingly allowed in the amount of $20,-000.00 and IT IS SO ORDERED.