**In the Matter of INTERCO INCORPORATED, et al., Debtors.**

**In re INTERCO INCORPORATED, Broyhill Furniture Industries, Inc.,**

**Richard Priest, Claimant.**

**Bankruptcy Nos. 91–40442–172, 91–40446–172.**
**Joint Admin. No. 91–40442–172.**
**Objection No. 23.**

United States Bankruptcy Court, E.D. Missouri, E.D.

March 19, 1993.

See also 149 B.R. 934.

274

Bryan, Cave, McPheeters & McRoberts, Gregory D. Willard, Lloyd A. Palans, Carl J. Spector, Vicki L. Little, St. Louis, MO, for debtors-in-possession.

Steven K. Brown, St. Louis, MO, Samuel H. Liberman, Clayton, MO, for claimant.

## MEMORANDUM

JAMES J. BARTA, Bankruptcy Judge.

At Saint Louis, in this District, this 19th day of March, 1993.

This Memorandum addresses the Debtors' objection to the proofs of claim filed by Richard Priest ("Claimant"). It also addresses Claimant's Motion for Jury Trial (**Motion Z–24**) and Claimant's objections to certain portions of Debtors' deposition designations.

This is a core proceeding pursuant to Section 157(b)(2)(B) of Title 28 of the United States Code. The Court has jurisdiction over the parties and this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334, and Rule 29 of the Local Rules of the United States District Court for the Eastern District of Missouri.

### I. BACKGROUND

On January 24, 1991, Interco Incorporated ("Interco") and thirty affiliated entities, including Broyhill Furniture Industries, Inc. ("Broyhill"), filed for relief under Chapter 11 of the United States Bankruptcy Code. The Debtors' Chapter 11 cases are being jointly administered for procedural purposes, pursuant to a January 25, 1991 Order of this Court.

The Debtors have continued in possession of their property and have operated and managed their businesses as debtors-in-possession, pursuant to 11 U.S.C. §§ 1107 and 1108. The Debtors' Amended Joint Plan of Reorganization was confirmed by this Court on June 26, 1992.

Claimant Richard Priest filed five proofs of claim: two proofs of claim against Broyhill; two proofs of claim against Interco; and one proof of claim against Broyhill and Interco. Two of the proofs of claim request $1,200,000 each and the remaining three proofs of claim request $460,000 each. Mr. Priest's claims are based on a non-bankruptcy lawsuit Mr. Priest filed against the Debtors in 1989. That non-bankruptcy lawsuit was filed in the United States District Court for Eastern District of Missouri (Cause No. 89–2098–C–4) and has been stayed as a result of these bankruptcy proceedings.

In the underlying lawsuit, Mr. Priest filed a four-count Amended Complaint alleging that Debtors violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA") and the Missouri Human Rights Act, Mo.Rev.Stat. Ch 213. Mr. Priest also asserted that Debtors breached an alleged implied employment contract and that Debtors violated the Employment Retirement Income Security Act, 29 U.S.C. § 1001, et seq., ("ERISA") by allegedly attempting to deny him benefits to which he is entitled under ERISA.

Mr. Priest filed a Motion for Relief from the Automatic Stay, which was later denied as withdrawn. Order Denying Motion for Relief from Automatic Stay, June 6, 1991.

On November 4, 1991, Debtors filed an objection to Mr. Priest's claims. Mr. Priest filed several motions requesting this Court to refrain from hearing and deciding the claim objection and requesting the United States District Court to withdraw the reference. On December 9, 1991, this Court denied Mr. Priest's request to stay the bankruptcy proceedings and abstain from hearing the objections to his claims. See In re Interco, 135 B.R. 359 (Bankr.E.D.Mo. 1991). On September 28, 1992, the District Court denied Mr. Priest's motion to withdraw the reference.

### A. *Motion for Jury Trial*

■ Mr. Priest also filed a Motion for Jury Trial of these issues which has not yet been addressed by this Court. The United States Supreme Court has held that there "is no constitutional right to a jury trial for determination of objections to claims." *Katchen v. Landy*, 382 U.S. 323, 336, 86 S.Ct. 467, 476, 15 L.Ed.2d 391 (1966); *see also Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990) (The Supreme Court explained that by filing a claim against a bankruptcy estate the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable powers.). This proceeding is an objection to the claims of Mr. Priest. Therefore, Mr. Priest has no constitutional right to a jury trial. The Motion for Jury Trial will be DENIED.

### B. *The Evidence and Deposition Designations*

The hearing on Debtors' objection to Mr. Priest's claims commenced May 13, 1992, continued on May 14th, May 21st, May 28th and concluded on June 4, 1992. This Court heard the testimony of witnesses for both parties, considered portions of certain depositions and reviewed many exhibits. After the trial, the parties submitted a "Stipulation as to Claimant's Post–Termination Earnings."

As part of the evidence to be considered by this Court, Claimant designated portions of certain depositions. Debtors submitted cross deposition designations and Claimant filed certain objections to Debtors' deposition designations. In his objections, Claimant asserts that the Debtors' designations are incomplete and misleading unless additional pages and lines are included. Debtors do not object to the additional deposition designations submitted by Claimant. Therefore, as to those portions of the depositions to which Claimant has submitted supplemental designations, Claimant's objections will be OVERRULED as settled.

■ Claimant also objected to Debtors' designation of page 84, lines 5–19 of the deposition of Richard Kerns. Claimant asserts this portion of the deposition is not responsive to the question. The question posed by Claimant's counsel concerned Claimant's Exhibit 7, which was a document written by Richard Kerns. Claimant's counsel asked for Mr. Kerns' interpretation of the comments contained in the document. In the colloquy which followed, Mr. Kerns explained some comments, did not recall others and explained that one comment could have been a "hypothetical example." *Deposition of Richard Kerns,* March 18, 1992, p. 84, lines 5–19. This Court finds that Mr. Kerns' answer is responsive to the question posed by Claimant's counsel in that it explains more fully a document that Claimant offered into evidence as Exhibit 7. Exhibit 7 was admitted in this trial subject to Debtors' opportunity to designate appropriate portions of Mr. Kerns' deposition. Claimant's objection to this portion of Mr. Kerns' deposition will be OVERRULED.

■ Claimant objects to Debtors' designation of page 8, lines 7–14 of the deposition of Gene Gunter. Claimant asserts that this designation constitutes hearsay. Claimant's counsel asked Mr. Gunter if he recalled "asking Mr. Harris to perform an analysis ..." Mr. Gunter responded that he did recall doing that. Claimant's counsel asked if Mr. Harris prepared such a study and Mr. Gunter replied, "Yes." *Deposition of Gene Gunter,* March 18, 1992, p. 8, lines 7–14. In this portion of the deposition, Mr. Gunter did not testify as to any statements made by anyone other than himself. This deposition testimony does not constitute hearsay; therefore, Claimant's objection will be OVERRULED.

■ Finally, Claimant objects to Debtors' designation of page 11, lines 15–19 of the deposition of Gene Gunter. Claimant asserts that this deposition designation is non-responsive. Claimant's counsel posed the following question: "Was your decision to fire him based on any personal recollections you had about his performance." Mr. Gunter responded that his decision was "based on the general recommendation of the senior management group for divisional

managers and the study that they relied on that was produced by Mr. Harris. And I have no recollection of the specific ... individual circumstances." Mr. Gunter's answer is responsive to the question; therefore, Claimant's objection will be OVERRULED.

Based on the evidence presented and the record as a whole, this Court makes the following findings of fact and conclusions of law.

## II. *FACTUAL BACKGROUND*

Mr. Priest testified that he was born February 14, 1934.[1] He received a degree from the University of Missouri in 1957, and his first job after graduation was with Broyhill. After completing the training program, Mr. Priest began work for Broyhill as a sales representative.

Broyhill is a furniture manufacturer with its headquarters in Lenoir, North Carolina. Broyhill distributes its furniture to retail furniture stores throughout the country by means of sales representatives who operate in one or more of Broyhill's divisions. Broyhill's divisions include: bedroom, dining room, upholstery, occasional and premier. These divisions are sometimes referred to as "bags." *Testimony of Lawrence Freiman,* May 14, 1992. A sales representative may be a "specialist" who carries only one bag, or the representative may carry two or more bags. *Id.* Each division is headed by a division vice president who oversees the accounts and sales representatives in that division throughout the country.

Each division is also divided into geographic territories, which are, in turn, headed by sales managers. Sales representatives report directly to the sales managers for their territories. Sales managers are responsible for, among other things, overseeing the daily and weekly activities of the sales representatives, approving the sales representatives' expense reports, responding to complaints and comments from customers about the sales representatives, evaluating the sales representatives' performance and reporting to the responsible division vice president on a regular basis regarding the sales representatives' performance.

Mr. Priest testified that he was assigned a geographic territory which included southeastern Missouri. At various times during his years with Broyhill, the boundaries of the areas assigned to Mr. Priest varied. At the time of his termination, his territory included the southeastern and central parts of Missouri.[2]

Mr. Priest testified that he handled the upholstery line or "bag" for Broyhill, and at various times during his tenure with Broyhill he carried other lines or "bags." During the years Mr. Priest worked for Broyhill, he worked under several division vice presidents and several different sales managers.

### A. *Mr. Priest's Work History*

Mr. Priest testified that he was a good sales representative and sales in his territory continually increased. According to Mr. Priest, although certain product lines were taken away from him, his volume increased. He also testified that, in his territory, upholstery sales constituted about forty percent of the total sales, a number that was higher than the national average by twelve or thirteen percent. Mr. Priest also claimed he was instrumental in establishing the "Gallery Program" which he described as a merchandising concept that had a "representation of each product manufactured by Broyhill."

Mr. Priest testified that he received numerous awards while he was a sales representative at Broyhill. In particular, Claimant's trial exhibits include award plaques for: "Top Ten Percentage Producers 1981" *Claimant's Trial Exhibit* No. 51; "Outstanding Sales Achievement Over $1,000,-

---

**1.** The parties did not stipulate to the accuracy of any facts.

**2.** Mr. Priest testified that in 1983, he "was given St. Jo[seph], Missouri and the counties north of it." He also testified his territory never included the St. Louis market, and only included the Kansas City area for about three or four months in 1982.

000 in Shipments in 1983" *Claimant's Trial Exhibit* No. 52; "Top percentage of Quota 1976" *Claimant's Trial Exhibit* No. 53; "Top Ten Percentage Producer 1974" *Claimant's Trial Exhibit* No. 54. In addition, Mr. Priest testified that he won a fifteen day trip to Mexico, other trips, cash awards, televisions and VCRs, and that Mr. Broyhill gave him a $6,000 chess set. In August of 1987, Mr. Priest won a trip to Bermuda for selling at or above his quota.[3]

Mr. Priest testified that he exceeded his quota in 1985, 1986 and 1987. He explained he was subject to three quotas. One quota was a "base" quota, upon which his salary was based. The sales representative received a three percent commission or bonus on "anything he shipped over the base quota." The second quota he described as a "net" or quota which was based on the amount of business the sales representative had done the previous year. The third quota was a goal established by the sales manager by which the manager divided the quota he had for the entire territory among the various sales representatives. According to Mr. Priest, during his last year with Broyhill, his net quota was $1,479,000 (from the previous year), he was given a "new" quota of $1,600,000 and he "shipped" approximately $1,800,000. In 1987, Mr. Priest exceeded his "bonus base" and was entitled to bonuses. *Claimant's Exhibit* No. 16. Mr. Priest also testified that when he left the company, he had about a $250,000 backlog.

In March of 1987, Mr. Priest was ranked second in sales and 20th in shipments out of 29 sales representatives. *Claimant's Exhibit* No. 13. In April of that same year, Mr. Priest was ranked fourth in sales and seventh in shipments. *Claimant's Exhibit* No. 14. Mr. Priest testified that on November 29, 1987 he was ranked fifth in sales and sixth in shipments.

Although Mr. Priest received various commendations and awards, and although he met or exceeded his quota during the years preceding his termination, Mr. Priest had a history of problems at Broyhill. The exhibits from Mr. Priest's personnel file reflect that Mr. Priest's superiors were frequently concerned with Mr. Priest's service to Broyhill's customers.

The personnel file contains a series of memos from Mr. Priest's sales manager to Mr. Priest in 1976 and 1977 which indicate that Mr. Priest failed to follow company policy by not filing weekly "call reports" and expense reports. *Debtors' Trial Exhibits* II and KK.

Mr. Priest's problems continued into the 1980s. In February of 1983, Mr. Priest was placed on probation. In a letter from Larry Waggoner, Mr. Priest's sales manager, Mr. Waggoner stated, "[M]y concern is with customer complaints on orders that they are not receiving or on orders that they are receiving that they did not order, and credits that they have coming that you have not followed through on." *Debtors' Trial Exhibit* EE. Mr. Priest was removed from probation in August of 1983; however, the problems continued.

In November of 1983, Larry Hazen, Mr. Priest's sales manager, outlined his concerns about Mr. Priest in a weekly factual report. After spending part of a week traveling with Mr. Priest, Mr. Hazen asserted that Mr. Priest had "an exceptionally bad attitude." Further, Mr. Hazen found Mr. Priest to be "extremely disorganized and rambling in his presentations." *Debtors' Trial Exhibit* CC. In a memorandum to Jack Ludwig (then the vice president of the upholstery division), Mr. Hazen recommended "immediate dismissal or at the least a short term probationary status[.]" *Debtors' Trial Exhibit* AA. According to Mr. Hazen, Mr. Priest failed to enter certain orders, neglected to follow up on paperwork "resulting in double shipments and severe inventory problems for several key accounts[,]" and exhibited a "[g]eneral lack of organization and bad attitude ..." *Id.*

3. At the deposition of Jack Ludwig (Senior Vice President of Broyhill), Debtors' counsel stipulated that there were no awards or commendations contained in Claimant's Deposition Exhibit No. 29, which was a copy of Mr. Priest's personnel file. *Deposition of Jack Ludwig,* March 19, 1992, p. 42.

In January of 1984, Mr. Priest was once again placed on probation. In a memorandum dated January 2, 1984, Mr. Hazen cited specific instances in which orders were not entered, orders were cancelled and orders were duplicated. *Debtors' Trial Exhibit* Y. In another memorandum dated January 4, 1984, Mr. Hazen informed Mr. Priest of another instance in which an order placed on November 26, 1983 was not phoned in until December 19, 1983. Mr. Hazen asserted, "This is the type of problem that is creating havoc through your territory." *Debtors' Trial Exhibit* X.

In August of 1984, a memorandum from Mr. Hazen to Mr. Priest outlined "recent situations" in Mr. Priest's territory. According to this memorandum, a customer had complained that certain orders "were never sent into [Broyhill's] office." Other customers complained that they had not received certain information or that their calls were not returned. In memos dated August 6 and August 10, 1984, Mr. Hazen stated, "Any further complaints from your dealers or lack of follow through on requests I make whether verbal or written will result in your immediate dismissal." *Debtors' Trial Exhibits* T and U.

Although Mr. Priest was removed from probation in 1984, his problems continued into 1985. According to memoranda in the personnel file, "[r]ecent input from the customer service department indicates that your service assistance is 'almost nonexistent.' The biggest problem being misquoting prices and overloading your dealers leading to cancellations and cancelled stock situations." *Debtors' Trial Exhibit* M, *see also Debtors' Trial Exhibit* N.

The personnel file contains further evidence of Broyhill's dissatisfaction with Mr. Priest throughout 1986. According to memoranda from Mr. Priest's sales manager (then Don Essenberg), Mr. Priest was "negligent" in "servicing the product and accounts and reporting to the factory on a timely basis." *Debtors' Trial Exhibit* H. In particular, Mr. Essenberg expressed concern that Mr. Priest was not calling on his accounts often enough, and his customer's problems and orders had not been handled in a timely manner. Further, Mr. Essenberg asserted, "We have received complaints from customers in the past stating orders were entered incorrectly, entered at the wrong price, or entered in the wrong quantities." *Id.* Mr. Essenberg also stated that Mr. Priest had been "consistently late with paperwork requirements of [his] job." *Id. See also Debtors' Trial Exhibit* I.

In a memorandum dated January 15, 1987, Mr. Essenberg asserted that Mr. Priest's customer service problems had not abated. According to this memorandum, a number of customers "expressed dis[s]atisfaction with the way [Mr. Priest] had been servicing their account[s]." *Debtors' Trial Exhibit* E. Mr. Essenberg stated that these customers complained that Mr. Priest had not informed them of a sales promotion, they could not rely on him to "take care of his customer service problems," and one customer claimed "his branch store still had not seen [Mr. Priest] for some time." *Id.*

### B. *Age Related Testimony and Evidence*

Mr. Priest testified that Gene Gunter, the President and Chief Executive Officer of Broyhill, made age related remarks. According to Mr. Priest, in 1983, "a young salesman was trying to disrupt distribution in central Missouri and ... Mr. Gunter said, 'I think Greg is a nice young man, why we ought to do things his way.'" When Mr. Priest disagreed, Mr. Gunter replied, "You know, you're awfully old to be looking for a job." Mr. Priest also claimed that "a few years later" Mr. Gunter made a similar remark, that he was "too old to be looking for a job." *Testimony of Richard Priest,* May 13, 1992.

### III. *THE REDUCTION IN WORK FORCE—1987*

By 1987, the Broyhill management believed that Broyhill was experiencing a "dramatic shrinkage of the account structure and the account base." *Testimony of Lawrence Freiman,* May 14, 1992. The "shrinkage" was a result of small "mom and pop" type stores going out of business

and the acquisition of smaller stores by larger stores. *Id.* At the same time, Broyhill's marketing strategy was to purposely reduce its number of accounts because, in part, the premier division would only sell to certain prestigious accounts. In addition, the Broyhill "gallery program" was expanding and these galleries were "guaranteed a protected distribution around their stores." *Id.* Because Broyhill had fewer accounts, Broyhill determined it needed fewer sales representatives.

In 1987, Gene Gunter, the President of Broyhill, formed a territory realignment committee consisting of the four divisional vice presidents of Broyhill: Jack Ludwig, Alan Cole, Guy Walters and Lawrence Freiman. *Deposition of Gene Gunter,* March 18, 1992, p. 7; *Testimony of Lawrence Freiman,* May 14, 1992. This committee asked a man named Howard Harris (referred to as a marketing specialist) to perform an analysis of market conditions and what Broyhill might do in terms of reducing or changing its sales staff to meet those conditions. *Id.* at 8. The basic goal of the study was to determine if a reduction of the sales force would result in a cost reduction and thus enhance Broyhill's competitiveness in the marketplace. *Id.* at 19.[4] The four committee members were responsible as a group for making final decisions regarding the reduction in work force; their decisions were reached after discussions and they "reached a consensus of opinion." *Testimony of Jack Ludwig,* May 28, 1992.

The committee studied the information provided by Howard Harris, and during "numerous meetings" from July to October of 1987, discussed this data and the committee members added their "own personal knowledge of different areas in the country." *Testimony of Lawrence Freiman,* May 14, 1992; *see also Testimony of Jack Ludwig,* May 28, 1992. As a first step, the committee identified the territories "where it was felt that some change should be made." *Id.* In particular, the committee decided the proper size of the territory. The changes in the size of the territory could include enlarging the territory or reducing the territory. As a second step, the committee decided how many sales representatives were necessary to cover the territory. The committee considered "changing the configuration of the bags that [a] salesman carried or a reduction in the number of salesmen in a territory ..." *Id.* In deciding how many sales representatives were necessary to service a particular territory, the committee considered the number of accounts a sales representative had in a territory, the number of galleries in a territory and many other factors. *Id.*

During the first two steps, no "personalities" were considered. After the decision was made to reduce the number of sales representatives in a territory, "it was necessary to look at the pool of people in that territory and decide which of those sales people [Broyhill] would keep and which ones [Broyhill] would not keep." *Id.* When deciding which sales representatives would be terminated, the committee expected the sales representative to "be doing well against quota." In addition, the committee was "very interested" in the "servicing of the territories." *Id.*

Mr. Freiman testified that, because of the galleries and a reduced number of sales representatives, Broyhill would be more and more service oriented. It was "imperative" that the sales representatives would "act with a sense of urgency" as to any problems experienced by the dealers. The sales representatives would be expected to communicate with the factory and do so in a timely manner. Therefore, the sales representatives were examined carefully to see how they were handling the service to their customers.[5]

---

**4.** The study, referred to at trial as the "Harris Report" was not admitted as evidence.

**5.** Mr. Freiman testified that at the time the decision was made to reduce the sales force, the decision was also made that there would be no transfers. Broyhill decided on the no transfer policy because the sales force was being reduced, and there was not really anywhere to transfer the unassigned sales representatives. *Testimony of Lawrence Freiman,* May 14, 1992 and May 21, 1992. One exception was made. That sales representative did not replace any other sales person. After the 1987 reduction in work force, three sales representatives

Mr. Freiman testified that, when deciding which sales representatives to retain, the decision makers looked at how a representative had performed over many years, perhaps as long as ten years. *Testimony of Lawrence Freiman,* May 14, 1992. Then the economic performance of the representative would be weighed against the quality of the service. He further testified that the committee used several resources in determining whether a sales representative was proficient in customer service. These resources included the customer service department at the Broyhill factory and the sales managers.

In particular, Mr. Freiman testified that the divisional vice presidents had monthly "sales and marketing meetings" with the sales managers. *Id.; see also Testimony of Jack Ludwig,* May 28, 1992. The sales managers for the entire company "would get up and discuss their region and the people that worked for them and would clearly state people that were doing excellent jobs and go into people that they weren't happy with or things that happened they weren't happy with." *Id.; see also Testimony of Jack Ludwig,* May 28, 1992. Mr. Freiman and Mr. Ludwig recalled that negative comments were made about Mr. Priest during those monthly meetings. Donald Essenberg, who supervised Mr. Priest for almost two years, testified that he expressed his opinion of Mr. Priest during the monthly meetings. In Mr. Essenberg's opinion, Mr. Priest lacked professionalism; in particular, Mr. Essenberg believed that Mr. Priest was "deficient in the areas of service, call frequency, and administration." *Testimony of Donald Essenberg,* May 14, 1992. As to customer service, Mr. Essenberg explained that Mr. Priest did not "handle dealer complaints, update sales aids and hold sales meetings . . . in the retail stores on a regular enough basis." *Id.* With respect to call frequency, Mr. Essenberg asserted that Mr. Priest let too much time elapse between his "instore visits." *Id.* Mr. Essenberg testified that Mr. Priest was deficient in administration because he did not adequately fill out

the necessary paper work, particularly so far as complaints about defective merchandise. Mr. Essenberg testified that he conveyed his opinions about Mr. Priest's performance to Alan Cole, the vice president and divisional manager of the upholstery division. Mr. Freiman also emphatically stated that the decision makers were familiar with all of the people that were terminated. *Id.*

Two of the committee members testified that the age of the sales representatives played no role in the decisions concerning the reduction in work force. *Testimony of Lawrence Freiman,* May 14, 1992; *Testimony of Jack Ludwig,* May 28, 1992. Mr. Freiman explained that age was not discussed when deciding the geographic configurations of the territories, how many sales representatives should be allotted to each territory or when deciding which sales representatives should be retained. However, age was discussed after the termination decisions were made because the members of the committee wanted to make sure they "were doing the right thing." *Testimony of Lawrence Freiman,* May 21, 1992.

Prior to the territorial reconfiguration, Mr. Priest's territories and the surrounding territories included: Territory 800 which encompassed the state of Kansas; Territory 400 which encompassed the greater Kansas City area; Territory 330 which encompassed central Missouri from the northern to the southern state border and included southwestern Missouri, northwestern Missouri and northeastern Missouri; Territory 333 which encompassed southeastern Missouri, and; Territory 730 which included the greater St. Louis area. Mr. Priest was the upholstery sales representative in Territories 330 and 333.

The committee determined these territories could be best served by combining territories as follows: Territories 800, 400 and approximately the western half of Territory 330 were combined into one territory; Territory 730 was increased to include

---

were offered transfers in lieu of termination. However, those transfers were offered at a later

time and there were open territories at that time. *Id.*

the eastern half of Territory 330 and all of Territory 333.

The committee decided the reconfigured Territory 800 could be handled by two representatives, rather than the four sales representatives that were assigned to those areas. The four committee members chose John Mitchell and Roland Maddrey and did not choose Mr. Priest and another sales representative.[6] Mr. Mitchell was assigned the upholstery bag for that territory. According to the testimony of one of the committee members, the committee chose Mr. Mitchell and Mr. Maddrey because they "were both good salesmen, with good rapport with the dealers and in [their] estimation very hard workers." *Testimony of Jack Ludwig*, May 28, 1992.

The committee chose not to assign Mr. Priest to the reconfigured Territory 800 because they were going to increase the territory and "his work habits were such" that it would not be appropriate to give him more territory. *Id.* None of the four committee members were supportive of Mr. Priest; rather, Mr. Cole (the upholstery divisional vice president) and Mr. Ludwig (a former upholstery divisional vice president) were "very negative." *Id.* Mr. Ludwig testified he could not support Mr. Priest due to the problems he had experienced with Mr. Priest during his tenor as upholstery divisional vice president and the problems with Mr. Priest that had continued to surface during the monthly sales and marketing meetings. *Id.*

The new Territory 730 also included part of Mr. Priest's territory. The committee decided that Harry McEuen, the upholstery sales representative for the former Territory 730 (St. Louis area), could cover all of the new Territory 730. *Id.*[7]

Broyhill eventually decided to terminate fourteen sales representatives. In November of 1987, the four divisional vice presidents and other Broyhill personnel conducted "exit interviews" at various cities throughout the country. *See Claimant's Exhibit* No. 20.

The personnel conducting the exit interviews were given a script to use, together with suggested responses to questions that might arise. The script read as follows:

The reduction of Broyhill accounts has necessitated a realignment of existing sales territories and subsequently a reduction in the number of Broyhill sales representatives.

*Claimant's Exhibit* No. 33 (entitled Work Force Reduction Statement). The divisional vice presidents testified they adhered closely to the script and to the suggested responses they were given. Mr. Freiman explained they did so to be fair to the sales representatives "as far as not hurting their dignity or their confidence in themselves." *Testimony of Lawrence Freiman*, May 21, 1992.

Mr. Priest was discharged on November 23, 1987. His exit interview was conducted by Jack Ludwig in Dallas, Texas. At the time of his termination, Mr. Priest was offered severance pay in exchange for a release of Broyhill from liability in connection with his discharge. Mr. Priest refused the severance pay. Mr. Priest filed a "Charge of Discrimination" with the Missouri Commission on Human Rights, which was sent to the Equal Employment Opportunity Commission for dual filing purposes. At this trial, Debtors stipulated the complaints were timely filed. Subsequently Mr. Priest filed the lawsuit against Broyhill alleging age discrimination.

Mr. Priest testified that in May of 1990, Broyhill distributed to him the balance of his Profit-sharing Retirement account. The amount Mr. Priest received was over $150,000.

## IV. LAW ON AGE DISCRIMINATION

 The proceedings in this case have arisen out of Debtor's objection to the

---

**6.** Roland Maddrey was born on 5/25/62; he was 25 years old at the time of the 1987 reduction in work force.

John Mitchell was born 1/26/47; he was 40 years old at the time of the 1987 reduction in work force. *Claimant's Exhibit* No. 66.

**7.** Harry McEuen was born on 10/20/50; he was 37 years old at the time of the 1987 reduction in work force.

claim of Richard Priest which was filed in compliance with 11 U.S.C. § 501 in this bankruptcy case. Section 502 of Title 11 of the United States Code provides:

A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects.

11 U.S.C. § 502(a).

"A properly filed proof of claim is prima facie evidence of the amount and validity of the claim, and a debtor who objects must offer evidence in rebuttal." *In re Paige*, 106 B.R. 346, 349 (Bankr.D.Conn.1989); *see also In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y.1990). "If the objecting party rebuts the claimant's prima facie case, 'it is for the claimant to prove his claim, not for the objector to disprove it.'" *In re Kahn*, 114 B.R. at 44 (quoting *In re Gorgeous Blouse Co., Inc.*, 106 F.Supp. 465 (S.D.N.Y. 1952)).

This Court finds that the Debtor has rebutted Claimant's prima facie case in the preliminary proceedings in connection with this claim objection. Thus, as this Court announced before the trial, the burden shifted to the Claimant to prove his claim. Accordingly, Claimant presented his case as a plaintiff would in this age discrimination claim, and Debtor responded as the defendant.

In the lawsuit filed in the District Court, Mr. Priest alleged that Debtors violated the Age Discrimination in Employment Act and the Missouri Human Rights Act.[8] "Missouri Courts have adopted federal standards enunciated in suits involving claimed violations of the Civil Rights Act of 1964." *Crittendon v. Columbia Orthopaedic Group*, 799 F.Supp. 974, 978 (W.D.Mo. 1992) (quoting *Valle Ambulance v. Commission on Human Rights*, 748 S.W.2d 710, 711 (Mo.App.1988)). The analysis under the Missouri Human Rights Act is the same as that under the Age Discrimination in Employment Act; therefore, this Court will not further distinguish between the Acts. *See Crittendon*, 799 F.Supp. at 978.

The Age Discrimination in Employment Act ("ADEA") provides in pertinent part:

It shall be unlawful for an employer—

(1) ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ...

29 U.S.C. § 623(a)(1).

### A. Order of Proof

"The United States Supreme Court set forth guidelines to analyze discrimination claims [under the Civil Rights Act of 1964] in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1242 (8th Cir.1991). It is well settled that those guidelines are applicable to age discrimination cases brought under the ADEA. *Hall v. American Bakeries Co.*, 873 F.2d 1133, 1134 (8th Cir.1989) (citations omitted).

According to the *McDonnell Douglas* guidelines, "the burden of production rests first with the plaintiff to establish a prima facie case of discrimination." *Hall v. American Bakeries*, 873 F.2d at 1134. If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to show some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* At this point, the burden is only one of production; the ultimate burden of persuasion remains with the plaintiff to show that but for his age, he would not have been adversely affected by the employment decision. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1364 (7th Cir.1988) (citations omitted); *Phipps v. Gary Drilling Co.*,

---

**8.** The pertinent part of the Missouri Human Rights Act reads:

It shall be an unlawful employment practice: (1) For an employer, because of the race, color, religion, national origin, sex, ancestry, age or handicap of any individual:

(a) To fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or handicap ...

Mo.Rev.Stat. § 213.055(1)(a) (1992).

*Inc.,* 722 F.Supp. 615, 619 (E.D.Cal.1989). If the defendant shows a legitimate reason, then the burden shifts back to the plaintiff to show by a preponderance of the evidence "that the defendant's proffered reason was pretextual." *Hall v. American Bakeries,* 873 F.2d at 1134 (citing *McDonnell Douglas,* 411 U.S. at 802–804, 93 S.Ct. at 1824–1825); *see also Mechnig v. Sears,* 864 F.2d at 1364.

### B. *Prima Facie Case*

■ The Eighth Circuit has outlined certain elements a plaintiff must establish in order to prove a prima facie case. If the defendant contends there has been a reduction in work force which has resulted in the elimination of plaintiff's position, the courts have held that the plaintiff must establish "special" requirements. *Hall v. American Bakeries,* 873 F.2d at 1134 (citing *Holley v. Sanyo Mfg., Inc.,* 771 F.2d 1161, 1166 (8th Cir.1985)). These elements include:

(1) The plaintiff is within a protected age group, which under the ADEA includes individuals "who are at least 40 years of age." 29 U.S.C. § 631(a);

(2) The plaintiff was performing his job at a level that met the defendant's legitimate expectations;

(3) Despite plaintiff's performance, he was terminated;

(4) Plaintiff's job in its various parts continued in existence.

*Johnson,* 931 F.2d at 1242–1243; *Hall,* 873 F.2d at 1134. In addition, if a reduction in work force is a factor, the plaintiff must present additional evidence that age was "a determining factor" in defendant's actions. *Id.*

Mr. Priest contends Debtors cannot show that they "engaged in a legitimate general reduction in force in November, 1987." *Claimant's Trial Brief,* filed May 11, 1992, p. 7. According to Claimant, "[t]here was no economic or business necessity to trim the sales force." *Id.* at 8. The Sixth Circuit Court of Appeals has defined a "true work force reduction case." *Barnes v. Gencorp Inc.,* 896 F.2d 1457, 1465 (6th Cir.1990), *cert. denied,* 498 U.S. 878, 111

S.Ct. 211, 112 L.Ed.2d 171 (1990). According to that court, "[a] work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Id.* If the situation is a true work force reduction, the employee is not replaced after his or her discharge. *Id.* "However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id.*

In this case, Broyhill eliminated 13 sales representative positions in November of 1987. According to the testimony of Jack Ludwig, after the reduction in work force, approximately 120 sales representatives remained. Mr. Ludwig testified that the number of sales representatives has not risen above 120 since the reduction in force and that, at the time of the trial, the sales force numbered less than 100. *Testimony of Jack Ludwig,* May 28, 1992. Therefore, this Court finds that this case constitutes a "true" work force reduction.

Claimant asserts, however, that this reduction in work force was not "legitimate" because Broyhill was not losing money, and therefore it was not "essential" that Broyhill reduce the number of sales representatives. The Broyhill decision makers testified that the decision was made to reduce the sales force in order to remain competitive in an increasingly demanding business environment. According to the testimony adduced at trial, Broyhill was experiencing a "dramatic shrinkage of the account structure and account base." *Testimony of Lawrence Freiman,* May 14, 1992. Thus, the Broyhill decision makers decided to reconfigure territories and reduce the number of sales representatives needed to service those territories.

■ It is not the responsibility of this Court to superimpose its business judgment on Broyhill. *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1216 (3rd Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989). Further, this Court has found no authority to support

the proposition that a company must be on the brink of collapse or in economic crisis before it can make decisions concerning the future productivity of the company. In this case, Broyhill's decision to decrease its sales force resulted from Broyhill's desire to avoid economic calamity and to remain competitive in an increasingly competitive business environment. *See Healy v. New York Life*, 860 F.2d at 1212, 1219. Thus, from the evidence presented in this case, this Court cannot find that the decision to reduce the sales force was not a "legitimate" reduction in work force.

■ The evidence shows that Mr. Priest was 53 years old when he was discharged, thus establishing the first element of his prima facie case. Mr. Priest also established the third and fourth elements as follows: Mr. Priest was discharged on November 23, 1987 and the evidence shows that other sales representatives continued to sell upholstery in the territories Mr. Priest previously serviced.

Mr. Priest must also establish prima facie evidence of age discrimination. "[T]he factually-oriented, case-by-case nature of ADEA claims requires that [this Court] not be overly rigid in [its] consideration of the evidence of discrimination a plaintiff may offer." *Holley v. Sanyo Mfg., Inc.*, 771 F.2d 1161, 1166 (8th Cir.1985); *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1243 (8th Cir.1991). As noted above, Mr. Priest testified that on two separate occasions, the President of Broyhill told him that he was "too old to be looking for a job." In addition, Mr. Priest presented evidence which includes a handwritten document, dated August 12, 1987, which lists "unassigned" sales representatives together with the ages of the representatives. *Claimant's Exhibit* No. 3. Claimant also presented a document entitled "Sales Territory Review For Immediate Action Reduction in Workforce" which lists fourteen sales representatives, their ages, years employed, 1986 salary and bonus, expenses, state and bag. *Claimant's Exhibit* No. 1. Mr. Priest's name is included on both lists.

Thirteen sales representatives were terminated in the November, 1987 reduction in work force. *Claimant's Exhibit* No. 1. Eleven of those sales representatives were over the age of 40; two sales representatives were under the age of 40. According to Claimant, 84.62% of the sales representatives discharged in November, 1987 were within the protected age group. Claimant argues that the impact of the reduction in work force was disproportionately greater on employees who were 40 years old or older.

Claimant also presented as evidence a handwritten document which Claimant asserts was written by Richard Kerns in connection with the 1987 reduction in work force. This handwritten document includes reference to the State of Arkansas and states "Age—Nice if above 40 yrs." The document also includes the following comments:

***Realigned Territories***

. . . . .

Can cut salary and bonus
Will cut their throats from an age
Go thru guys that we have a big exposure in
Don't have to offer to all. (Protected group 40 ...)

*Claimant's Exhibit* No. 7.

The Eighth Circuit has held that in reduction in work force cases, a plaintiff may present direct or circumstantial evidence of age discrimination to establish a prima facie case. *Holley v. Sanyo*, 771 F.2d at 1166. Direct evidence may include statistical evidence, such as the evidence presented by this Claimant. In addition, this Claimant presented evidence including statements made about age and documents which included notations about the ages of the employees who were to be discharged. This Court finds that, pursuant to the directions espoused by the Eighth Circuit, this evidence suffices to establish a prima facie case of age discrimination.

The second element of a prima facie case of age discrimination requires the plaintiff to show that he was performing his job at a level that met the defendant's legitimate expectations. Mr. Priest proved that he generally met or exceeded his sales quotas

for the years preceding his termination. However, Broyhill representatives testified that sales representatives were also expected to maintain a certain level of customer service. The evidence admitted at trial demonstrates that Broyhill Management repeatedly documented their displeasure with the way Mr. Priest serviced his accounts. According to Broyhill, customer service was an important part of a sales representative's responsibilities. Arguably, then, Mr. Priest did not establish a prima facie case of age discrimination because he did not prove that he was meeting Broyhill's legitimate expectations. However, even if Mr. Priest did establish a prima facie case, Broyhill presented legitimate, nondiscriminatory business reasons for discharging this employee.

## C. Legitimate Nondiscriminatory Reasons for Discharge

■ Debtors proved that in 1987, Broyhill decided to reduce the number of sales representatives. This was accomplished by reconfiguring the territories to which the sales representatives were assigned. After the territories were reconfigured, the committee decided how many sales representatives were needed to service a particular territory.

As part of the realignment of territories, Mr. Priest's territories were divided and added to other territories. Broyhill decided that Mr. Priest's territories on the eastern side of Missouri could be joined with the St. Louis area territory, and the upholstery sales representative already servicing the St. Louis area could assume the responsibility for the whole area.

The western part of Mr. Priest's territory was added to the Kansas City territory and the Kansas territory. Broyhill decided that the entire territory could be serviced by two sales representatives. The decision makers testified that they chose two sales representatives who "were both good salesmen, with good rapport with the dealers and in [their] estimation very hard workers." *Testimony of Jack Ludwig,* May 28, 1992. The committee did not choose Mr. Priest because they did not believe he had the requisite customer service skills to handle the expanded territory. They based this decision on the information they had received from Mr. Priest's sales managers over the years, and at least in one case on personal experience with Mr. Priest.

This Court does not "sit as a super-personnel department that reexamines an entity's business decisions." *Mechnig v. Sears,* 864 F.2d at 1365 (quoting *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)). Nor was the ADEA "intended as a vehicle for the general judicial review of business decisions." *Phipps v. Gary Drilling,* 722 F.Supp. at 620. Therefore, this Court "will not re-evaluate business decisions made in good faith, even though they have some negative impact on age-protected individuals, and will not 'second guess' an employer's business judgments in an effort to find some possible violation of the Act." *Id.* (citation omitted).

This Court finds that the reasons articulated by Broyhill for not choosing Mr. Priest as one of the sales representatives to be retained fall within the ambit of reasonable business judgments and decisions. It is not unreasonable for the employer to select for retention sales representatives who are perceived as having good customer service skills. Neither is it unreasonable for this employer to select for termination a sales representative who is perceived as a problem to the company because of his apparent unwillingness or inability over the years to comply with the expectations of his employer in the area of customer service.

## D. Pretext

This Court also finds that Mr. Priest has not proved that the proffered reasons for his termination are pretextual. Mr. Priest attempted to demonstrate that his poor customer service record could not be a factor in his termination, because the decision makers admitted that they did not examine his personnel record when they were making their decision. However, the decision makers testified that they were familiar with Mr. Priest's work history. Two senior vice presidents testified to long-term

knowledge of the problems with Mr. Priest. They asserted they had attended monthly sales and marketing meetings during which negative comments were made about Mr. Priest. One of Mr. Priest's former sales managers also testified that during these meetings the manager had expressed his opinion that Mr. Priest was "deficient in the areas of service, call frequency, and administration." *Testimony of Donald Essenberg,* May 14, 1992.

This Court finds that the testimony of the decision makers is credible: they were familiar with the problems the sales managers had experienced with Mr. Priest. The evidence that the decision makers did not examine the personnel record is not determinative. The copies of memoranda contained in the personnel record were documentation of the problems experienced by Mr. Priest's superiors. This documentation indicates that the opinions expressed therein were communicated to superiors. However, the evidence also shows a parallel communication track in that the problems were communicated directly and verbally at the monthly meetings.

Mr. Priest also attempted to show that even if the decision makers were cognizant of the complaints about his customer service record, Broyhill actually placed more emphasis on sales and shipments as a measure of performance.[9] Mr. Priest proved he generally met or exceeded his quota during the years preceding his termination and that he won awards and bonuses, as noted above. However, Broyhill proved that management was consistently concerned about customer service. This concern is evidenced by numerous memoranda in the personnel file and the evidence that Mr. Priest had twice been put on probation for inadequate attention to the customer service aspect of his job. This Court finds that Broyhill legitimately expected its sales representatives to visit customer's stores on a regular basis, turn in orders without duplicating those orders, respond to customer complaints in a timely fashion and communicate customers' problems to Broyhill. Further, this Court finds that the Broyhill decision makers, relying on information and opinions communicated by Mr. Priest's supervisors, decided to terminate Mr. Priest because they were convinced he had not demonstrated good customer service skills in the past and he would not be the best sales representative for the newly expanded territory.

Finally, this Court notes that the evidence of age discrimination that Mr. Priest presented which established a prima facie case is not sufficient to overcome this Court's finding that Broyhill discharged Mr. Priest for legitimate business reasons. As noted above, Claimant presented evidence which showed that Broyhill noted the ages of sales representatives in connection with the reduction in work force. However, the Eighth Circuit has noted that "[s]ome companies facing a reduction in force situation initiate some kind of plan in which objective criteria are used to determine ... the effect of layoffs on protected groups." *Goetz v. Farm Credit Servs.,* 927 F.2d 398, 403 n. 2 (8th Cir.1991). According to the testimony of the Broyhill decision makers, the age of the sales representatives was discussed after they decided which representatives would be discharged. The ages of those sales representatives were discussed because Broyhill wanted to make sure they "were doing the right thing" and could "substantiate what they were doing." *Testimony of Lawrence Freiman,* May 21, 1992.

## V. IMPLIED EMPLOYMENT CONTRACT

▮▮▮▮ Mr. Priest testified that in the 1960s he was told by Paul Broyhill, then the President of Broyhill, "If you keep

---

9. Claimant presented a document identified as a performance report which lists eight areas of sales performance and weights those different areas in terms of percentages. This performance report lists "shipments performance" and that criterion is weighted at 70%. However, this document is dated "6/29/79." *Claim-ant's Exhibit* No. 12; *Deposition of Jack Ludwig,* March 19, 1992, pp. 48–49. According to the testimony presented at trial, this 1979 performance review "was a very short-lived report" and was only used for "a year or a year and a half." *Testimony of Jack Ludwig,* May 28, 1992.

doing a good job, you'll have a job as long as you want one." This Court finds that this statement does not rise to the level of an implied employment contract. Further, even if this Court found the existence of an implied employment contract, Broyhill proved that Mr. Priest was discharged in connection with a reduction in work force, in particular because his performance in the area of customer service was not satisfactory. Thus, Claimant cannot support his claim of breach of an implied employment contract.

## VI. *ERISA*

■ As noted above, the claims of Richard Priest are based on the allegations first raised in the underlying lawsuit filed in the United States District Court for the Eastern District of Missouri. In the Amended Complaint, which was attached to the proofs of claim filed in this bankruptcy case, Mr. Priest alleged Broyhill's actions "constitute proscribed activity under § 510 of the Employee Retirement Income Security Act of 1974 (ERISA)."

Section 510 of ERISA provides:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . ..

29 U.S.C. § 1140.

Claimant did not prove that Broyhill discharged him "for the purpose of interfering with the attainment of any right" to which Mr. Priest may have become entitled under the provisions of an employee benefit plan. Rather, Debtors proved that Broyhill discharged Mr. Priest for legitimate business reasons, as outlined above. Therefore, this Court finds Mr. Priest cannot sustain his claim that Debtors violated ERISA by discharging him.

## VII. *CONCLUSION*

In conclusion, this Court finds that Debtors presented sufficient evidence to prove that Broyhill discharged Mr. Priest for legitimate business reasons, and that Mr. Priest did not prove that the proffered reasons were pretextual or that age was a factor in Mr. Priest's discharge. This Court further finds that Broyhill did not violate the Age Discrimination in Employment Act or the Missouri Human Rights Act in connection with Broyhill's discharge of Mr. Priest. In addition, this Court finds that Mr. Priest did not prove that Debtors breached an implied employment contract; nor did Mr. Priest prove that Debtors violated the Employment Retirement Income Security Act. Therefore, Debtors' objection to the claims of Richard Priest will be SUSTAINED and the claims not allowed.

### *ORDER*

At Saint Louis, in this District, this 19th day of March, 1993.

On consideration of the record as a whole, and consistent with the Memorandum entered in this matter,

**IT IS ORDERED** that this matter is concluded; and

(A) That the motion of Richard Priest ("Claimant") for a jury trial of the issues in this matter (**Motion Z–24**) is **DENIED**; and

(B) That Claimant's objections to those portions of certain depositions to which Claimant has submitted supplemental designations are **OVERRULED**; and

(C) That Claimant's objections to portions of the depositions of Richard Kerns and Gene Gunter are **OVERRULED**; and

(D) That the claim of Richard Priest for breach of an implied employment contract is **NOT ALLOWED**; and

(E) That the Debtors' objections to the claims of Richard Priest, numbered 47, 376, 377, 3752 and 3753 are **SUSTAINED**; and that said claims are **NOT ALLOWED** in these bankruptcy cases.