In the Matter of INTERCO
INCORPORATED, et
al., Debtors.

In the Matter of INTERCO INCOR-
PORATED and Senack Shoes
of Connecticut, Inc.,

Claim of William McGOVERN.

Bankruptcy Nos. 91–40442–
172, 91–40472–172.

United States Bankruptcy Court,
E.D. Missouri, E.D.

May 7, 1993.

JAMES J. BARTA, Bankruptcy Judge.

This Memorandum addresses the amended objection of Debtors Interco Incorporated, Senack Shoes of Connecticut, Inc. and Converse, Inc. to the claims filed by Claimant William McGovern (Claim Objection No. 40). It also addresses Claimant's Motion to Admit Life Expectancy Table (Motion Z–157).

This is a core proceeding pursuant to Section 157(b)(2)(B) of Title 28 of the United States Code. The Court has jurisdiction over the parties and this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334, and Rule 29 of the Local Rules of the United States District Court for the Eastern District of Missouri.

## I. *Background*

On January 24, 1991, Interco Incorporated ("Interco") and thirty affiliated entities, including Senack Shoes of Connecticut ("Senack") and Converse, Inc. ("Converse"), filed for relief under Chapter 11 of the United States Bankruptcy Code. The Debtors' Chapter 11 cases are being jointly administered for procedural purposes, pursuant to a January 25, 1991 Order of this Court.

The Debtors have continued in possession of their property and have operated and managed their businesses as debtors-in-possession, pursuant to 11 U.S.C. §§ 1107 and 1108. The Debtors' Amended Joint Plan of Reorganization was confirmed by this Court on June 26, 1992.

On June 7, 1991, Claimant William McGovern filed Proof of Claim No. 2782 against Interco and Proof of Claim No. 6058 against Converse. Each proof of claim requested damages of $1,000,000 for alleged age discrimination.

Bryan, Cave, McPheeters & McRoberts, Gregory D. Willard, Lloyd A. Palans, John C. Boyle, Carl J. Spector, St. Louis, MO, for debtors-in-possession.

Thomas J. Gleason, Gleason Law Offices, P.C., Haverhill, MA, for claimant.

On December 2, 1991, Debtors Interco and Senack filed an objection to Proof of Claim No. 2782. Debtors asserted that Mr. McGovern's claim should be disallowed because "it was improperly filed on a consolidated basis, naming both Debtors on a sin-

gle Proof of Claim form ..." Claimant listed Interco Incorporated as the name of the debtor, but listed two bankruptcy case numbers. One of the case numbers was that of Interco and the other case number was assigned to Senack.

In his response, Claimant asserted that he inadvertently listed the case number assigned to Senack. Claimant further demonstrated that he had filed separate proofs of claim against Interco and Converse and did not intend to pursue a claim against Senack.

On July 27, 1992, Debtors filed an amended objection to both of the proofs of claim filed by Mr. McGovern. In the amended objection, Debtors continued to assert that Claim No. 2782 should be disallowed because it named Interco and Senack on a single proof of claim form. Further, Debtors argued Claim No. 2782 should be disallowed because Mr. McGovern has never been employed by Senack and, although Converse is an Interco subsidiary, Mr. McGovern "has never been directly employed by Interco." Debtors asserted both claims should be disallowed because they are substantively without merit.

On August 5, and August 6, 1992, through the vehicle of an objection to proofs of claim, this Court conducted a trial on the merits of the claims of Mr. McGovern. The parties entered into a stipulation of facts and a stipulation of admissibility as to certain exhibits. Thereafter, the Court heard the testimony of witnesses for both parties and reviewed numerous exhibits.

▮ After the trial, Claimant filed a motion to admit a life expectancy table. The Debtors have opposed admission of this document. Each party filed a memorandum in support of its position. This Court finds that the Life Expectancy Table is relevant to a material issue that is properly before the Court: Should Mr. McGovern's claim of lost pension benefits be allowed? Further, this Court finds that Debtors will not suffer any prejudice by allowing introduction of the Table. Therefore, Debtors' objections are overruled and the Life Ex-

pectancy Table is admitted as Claimant's Exhibit No. 42.

In October of 1992, after the trial of this matter, Debtors filed a memorandum regarding the findings of the Equal Employment Opportunity Commission ("EEOC") with regard to Mr. McGovern's discharge from Converse. Neither party has requested that this Court admit the finding of the EEOC as evidence. Therefore, this Court has not based its decision in any part on the information contained in Debtors' submission in October, 1992. This Memorandum is based on a consideration of the evidence presented and the record as a whole, other than the Debtors' October, 1992 memorandum.

## II. *Factual Background*

In 1972, William McGovern began his employment at Converse. *Stipulation of Facts*, filed August 6, 1992, p. 2. From 1972 to 1974, he was employed in Converse's Merchandising/Product Control area. *Testimony of William McGovern*, August 5, 1992. In 1974, he was promoted to the Customer Service area, where he worked through 1976. *Id.* From 1977 to 1979, Mr. McGovern was employed in Converse's Sales Division—Outdoor Sports Equipment. *Stipulation of Facts*, p. 2. From 1979 to 1982, Mr. McGovern was the International Sales Manager—Far East for Converse. *Testimony of William McGovern*, August 5, 1992.

### A. National Accounts Executive— 1983–1987

In 1983, Mr. McGovern joined the National Accounts Team as a National Accounts Executive. Mr. McGovern described National Accounts as a "key division within the company." *Testimony of William McGovern*, August 5, 1992. The National Accounts were the "high profile accounts" that did a higher volume of business, were called on by sales representatives more often, and were very important to the success of the company. *Id.*

Mr. McGovern explained that his duties as a National Accounts Executive included a great deal of planning and interaction

between the corporate headquarters of Converse and the corporate headquarters of the account. *Id.* According to copies of performance reviews which were admitted as evidence at this trial, Mr. McGovern's supervisors were pleased with his performance. The various supervisors commended Mr. McGovern for putting together "a very creative sales program with a very large account ..." during his first year on the National Accounts Team. *Claimant's Exhibit* No. 21. He was also described as "handling his three national accounts with both poise and professionalism." *Id.*

In 1984, Mr. McGovern was found to be "both aggressive and professional in carrying out his job responsibilities." *Claimant's Exhibit* No. 20. Mr. McGovern "continued to perform in an outstanding manner" in 1985. *Claimant's Exhibit* No. 19. Throughout 1986, Mr. McGovern's "efforts continue[d] at the high level they [had] been." *Claimant's Exhibit* No. 18.

During these years as a National Accounts Executive, Mr. McGovern was praised for generating a high volume of sales and achieving increased sales "[u]nder very difficult conditions, and in an essentially flat market ..." *Claimant's Exhibits* No. 19 and No. 20. Mr. McGovern explained that the "difficult conditions" Converse was experiencing included the fact that the athletic footwear market had been "growing very rapidly ... by leaps and bounds" through the early 1980s and into the late 1980s. Nike and Reebok were gaining market share, but the market was "flat" from the "perspective of Converse." *Testimony of William McGovern,* August 5, 1992. In addition, the retail sales of some of Mr. McGovern's accounts were "not very good" which made it more difficult for Converse to "keep [its] brand in these accounts." *Claimant's Exhibit* No. 18; *Testimony of William McGovern,* August 5, 1992. Mr. McGovern testified that during his performance evaluations throughout these four years as a National Accounts Executive, his supervisors took

into consideration Converse's difficulties in the athletic footwear market and the financial situation of his accounts. *Testimony of William McGovern,* August 5, 1992.

Mr. McGovern testified that he was named "Salesman of the Year" in 1985 and 1986. He explained that this award was based not only upon sales volume, but also took into consideration how the sales person managed his accounts. *Id.* .

## B. Director of National Accounts— 1987–1989

In March of 1987, Mr. McGovern was promoted to Director of National Accounts. *Id.* As Director of National Accounts, Mr. McGovern was responsible for managing the National Account Executives, visiting the accounts on a regular basis, planning sales goals and establishing sales quotas, and controlling "what was happening within the national account territory ..." *Id.* Claimant's exhibits include a performance review from the period of time when Mr. McGovern was Director of National Accounts. According to the reviewer, Mr. McGovern did a "good job of expanding the efforts of all national account executives at a very high level." [1] *Claimant's Exhibit* No. 17. He "put in some additional reporting procedures" which allowed Converse management to "better understand all information and progress that [was] being made with national accounts." *Id.* In addition, Mr. McGovern was "actively involved in presentations and visitations to corporate headquarters of the national accounts, as well as gathering information from the marketplace." *Id.*

Mr. McGovern explained that as Director of National Accounts, he pursued a "more aggressive approach." *Testimony of William McGovern,* August 5, 1992; *Claimant's Exhibit* No. 17. Among other things, he encouraged a program to "leverage in" certain products: if the account bought one product, the account was encouraged to buy another product, which would give

---

1. Debtors have asserted that Mr. McGovern performed poorly as Director of National Accounts. *Debtors' Trial Brief,* filed May 18, 1992, p. 2. The evidence presented at this trial does not support this assertion. Failure to prove this assertion does not alter this Court's judgment with respect to Mr. McGovern's performance in later years.

Converse more "shelf space." *Id.* Mr. McGovern testified that the more aggressive approach was important because Nike, Reebok and L.A. Gear were still taking away market share from other companies, including Converse. *Id.* He explained that except for the Converse All–Star program, Converse was still in a relatively flat market.

Mr. McGovern was Director of National Accounts during fiscal years 1988 and 1989.[2] The evidence presented by Claimant shows that National Accounts achieved record sales of $63 million in fiscal year 1988. *Claimant's Exhibit* No. 33. In fiscal year 1989, National Accounts' sales fell to $41.9 million. Mr. McGovern testified that 1988 was "a tremendous year for the canvas All–Star" program, but that business "dropped off drastically in 1989." *Testimony of William McGovern,* August 5, 1992. According to Mr. McGovern, the All–Star program was a fad with teenagers which "went out of fashion almost as quickly as it was in fashion." *Id.*

Despite the reduced sales in 1989, Mr. McGovern testified that he had worked harder than ever. He asserted he was still involved with the National Accounts on a day-to-day basis and still pursued a "more aggressive approach." *Id.* Mr. McGovern testified that in fiscal year 1989, the market for athletic footwear was increasing; however, Converse was losing market share. *Id.* Mr. McGovern testified he was never disciplined for the performance of National Accounts in fiscal year 1989, nor was he told that his performance during that year was unsatisfactory.

At the end of fiscal year 1989, Mr. McGovern made certain suggestions for reorganizing the National Accounts division. As part of this reorganization, Mr. McGovern voluntarily relinquished his position as Director of National Accounts and returned to a position as a National Accounts Executive. *Id.* Mr. McGovern testified that while he enjoyed his tenure as Director of National Accounts, he returned to the National Accounts Executive position because he wanted to get back to "calling on the accounts and not be involved as much with the paperwork end of it ..." *Id.*

As part of his transition back to a National Accounts Executive position, Mr. McGovern selected the accounts which he would handle. Mr. McGovern testified that he chose three accounts which had declining sales from fiscal year 1988 to fiscal year 1989: J.C. Penney, Herman's and Thom McAn. *Id.* He was also responsible for the "Military" account. Mr. McGovern asserted that he selected the declining accounts because he was familiar with them, and felt that if he assumed responsibility for these accounts, it would benefit Converse.

## C. National Accounts Executive— 1989—October 9, 1990

Mr. McGovern returned to his position as a National Accounts Executive in March of 1989, which was the beginning of fiscal year 1990. Bill Adams was promoted to Director of National Accounts. *See Claimant's Exhibit* No. 1. Between fiscal year 1989 and fiscal year 1990, J.C. Penney, Herman's and Thom McAn continued in a declining sales mode. *Claimant's Exhibit* No. 33. Mr. McGovern asserted that sales to his accounts continued to decline because, as in the past, Converse continued to lose market share while Nike, Reebok and L.A. Gear continued to gain market share.

### 1. Fiscal Year 1990

At the beginning of each fiscal year, each National Accounts Executive was given a "plan goal" with respect to each of his accounts. The Director of National Accounts outlined the four factors he used to set the plan goals: (1) the potential of the account, which incorporated store growth; (2) the experience of the sales representative; (3) the state of the business of the accounts; and (4) the direction of the account—if Converse and the account had the

---

**2.** Converse's fiscal year runs from March 1 of one calendar year through February 28 of the next calendar year. For example, fiscal year 1989 would end on February 28, 1990. *See Debtors' Trial Brief,* filed May 18, 1992, p. 3.

same strategy.[3] *Testimony of Bill Adams*, August 6, 1992. The Director of National Accounts testified that he calculated the percentage of completion of plan by dividing the final year end shipments by the plan volume or goal number. Mr. McGovern and Mr. Adams, the Director of National Accounts, both testified that the National Accounts, including J.C. Penney, operated primarily on a "future order" basis. The accounts would place orders five to six months prior to shipment. The Director explained that because of the future order orientation of National Accounts, there are key "selling windows" which include: Spring, Back-to-School and the Holiday period.

In October of 1989, Mr. McGovern received a memorandum titled "The Changing Face of the Converse National Account Executive." *Claimant's Exhibit* No. 2. In this memo, the Director of National Accounts informed Mr. McGovern that the "Marketing Department will be in a state of transition for several months so it becomes your responsibility to seek out resources to assist you in developing an integrated sales and marketing program for your accounts." According to the Director, Mr. McGovern's "three accounts [were] wallowing through a dismal year ..." *Id.* Thus, it was necessary for Mr. McGovern to "be more involved in the marketing aspect with each account." *Id.*

Mr. McGovern was the only National Accounts Executive who received a copy of this "Changing Face" memorandum. *Testimony of Bill Adams*, August 6, 1992. He testified that he thought that the criticism in the memorandum was not fair and that he was "being singled out." Mr. McGovern explained that he only assumed responsibility for the accounts in March of 1989, and it was very difficult to turn around the declining sales within a six month period because of the "future order situation." According to Mr. McGovern, his ability to increase sales was also adversely affected by the changes in the marketing department; there were four different vice presidents of marketing within four to five years. He asserted that each new marketing vice president focused on a new marketing program.

Bill Adams, the Director of National Accounts, testified that his superior, Mickey Bell, had challenged him to stem the decline in National Accounts. *Testimony of Bill Adams*, August 6, 1992. In order to reverse this decline, Mr. Adams determined that the National Accounts Executives needed to be very involved with marketing, product development and advertising and needed to be more aggressive, resourceful and creative. He asserted that this was a major theme which he discussed in each of his meetings with the National Accounts Team. Mr. Adams testified that he followed up these discussions with the memorandum to Mr. McGovern, in which he discussed the "changing face" of Converse. *Id.*

The Director of National Accounts asserted that Mr. McGovern had been responsible for his accounts for six months and since the sales goals were not being achieved, Mr. McGovern needed to change "how he was attacking his business ..." *Id.* The Director testified that Mr. McGovern needed to determine what kind of products his accounts needed and, if Converse did not offer such a product, Mr. McGovern needed to work with the product development department to assure that the needed product would be designed. In addition, Mr. McGovern needed to help develop programs to "place" Converse products with his accounts, which might include supporting the product with advertising.

The Director felt that J.C. Penney was an "excellent outlet for canvas All–Stars." He asserted that Mr. McGovern never "finally executed" the program, and as a result "canvas was not a major program for J.C. Penney." The Director testified that the athletic footwear industry was changing. He asserted that as part of this change, marketing became even more im-

---

**3.** In his testimony, the Director of National Accounts, Bill Adams, sometimes referred to "plan volume" instead of "plan goal."

portant. Particularly at the National Accounts level, the accounts were concerned about Converse's marketing plans and programs. Further, the Director saw that there were "opportunities ... to customize marketing plans for each of these major accounts."

In a performance appraisal dated April 25, 1990, Mr. McGovern was given the rating of "3.5" which the Director of National Accounts described as "less than fully proficient." The Director testified that National Accounts Executives "should be in a 1.5 to 2.5 range." *Testimony of Bill Adams*, August 6, 1992. The Director noted that "[b]oth J.C. Penney and Herman's continue to be in a declining sales mode and it is imperative Bill [McGovern] finds a way to reverse the trend in these two key accounts." *Debtors' Exhibits* C and D. The Director stated that Mr. McGovern should "probe for opportunities" and "'chase' down the resources needed to secure that business." *Id.* In particular, Mr. McGovern needed "[m]ore direct communication with Marketing and Product Development[.]" *Id.*

In fiscal year 1990, Mr. McGovern achieved 40.2% of his plan goal: his plan goal was $11.2 million, and his actual sales amounted to $4.49 million. *Claimant's Exhibit* No. 9.

### 2. *Fiscal Year 1991*

In fiscal year 1991, Mr. McGovern's total plan goal was reduced from $11.2 million to $8.1 million. The plan goals for each of the accounts were as follows: J.C. Penney—$4.2 million; Herman's—$2.0 million; Military—$1.7 million; and Thom McAn—$200,000. *Claimant's Exhibit* No. 9. Mr. McGovern testified that he "worked diligently" to "turn [his] accounts around ..." *Testimony of William McGovern*, August 5, 1992. Nonetheless, sales to J.C. Penney, Herman's and Thom McAn continued to decline in fiscal year 1991. *See Claimant's Exhibit* No. 33.

The Director of National Accounts testified that Mr. McGovern did not dramatically change his approach to his accounts. According to the Director, during the

months following the performance appraisal, Mr. McGovern had the opportunity to "make some key sales" during certain "selling windows." After the April performance appraisal, Mr. McGovern would be selling for the Holiday selling window, through May and June. Then, Mr. McGovern would be selling in July, August and September for the Spring selling window. The Director testified that Mr. McGovern did not secure any "major orders" for the Holiday selling window. Therefore, on July 3, 1989, the Director told Mr. McGovern that during the next 60–90 days it was imperative for him to secure some major business. Mr. McGovern was instructed to present a written plan describing how he intended to improve his sales. *Testimony of Bill Adams*, August 6, 1992.

On July 13, 1990, Mr. McGovern outlined his plan to increase sales in a memorandum to the Director. *Claimant's Exhibit* No. 3. On July 26, 1990, the Director of National Accounts issued a memorandum titled "The 45–Day Challenge." *Claimant's Exhibit* No. 4. In this memorandum, the Director stated that Mr. McGovern's plan was "unsatisfactory due to its obvious lack of sufficient preparation as witnessed by its basic nature, its lack of specific action steps, and its lack of creative thought." Further, the Director asserted, "If in the next 45 days you do not achieve definitive progress toward reaching the acceptable minimum levels of $800,000 for Herman's and $3,400,000 for J.C. Penney's, I will be forced to remove you from our National Account team." *Id.*

Mr. McGovern was the only National Accounts Executive who received this "45–Day Challenge" memorandum. *Testimony of Bill Adams*, August 6, 1992. He asserted that prior to receiving the memorandum, he was not familiar with the standard "acceptable minimum levels;" nor was he aware that the standard was generally used in the National Accounts division. In addition, Mr. McGovern asserted the goal of "definitive progress" was a vague, undefined goal. *Testimony of William McGovern*, August 5, 1992. According to Mr. McGovern, the demands set forth in this

memorandum were "unreasonable" because "National Accounts is a long-term operation ... and it's virtually impossible to gain immediate business." *Id.*

Debtors asserted that the 45–day deadline was neither arbitrary nor unreasonable. According to the Director of National Accounts, future orders for the end of the fiscal year had to be placed by the end of September in order to ship by the end of the fiscal year. The "45–Day Challenge" memorandum was sent on July 26, 1990; the deadline set out in this memorandum would have been around the middle of September. The Director of National Accounts also testified that he established the "acceptable minimum levels" in accordance with compensation policies at Converse. He explained that the goals of $800,000 for Herman's and $3.4 million for J.C. Penney totalled $4.2 million and that $4.2 million equalled 70% of the combined plan goals for J.C. Penney and Herman's for fiscal year 1991. The Director asserted that Converse's written compensation plan provided that if the National Account Executives do not achieve 70% of their plan goals, they do not receive any bonuses. *Testimony of Bill Adams,* August 6, 1992; *Claimant's Exhibit* No. 41, p. 3. No evidence was presented which showed that it was Converse's official policy to terminate a National Accounts Executive if the Executive did not achieve 70% of his plan goal. The Director of National Accounts testified that it was realistic to expect Mr. McGovern to achieve the acceptable minimum levels within 45 days. According to the Director, Mr. McGovern had already sold $1.8 million to J.C. Penney, and he "was selling into a very key buy period"—spring. Thus the Director asserted it was realistic to expect Mr. McGovern to sell $1.4 million more to J.C. Penney within 45 days.

On September 21, 1990, the Director of National Accounts sent a memorandum to Mr. McGovern describing his year-to-date performance. *Claimant's Exhibit* No. 7; *Testimony of Bill Adams,* August 6, 1992. The Director reiterated the "minimum acceptable standards" he had set out in the "45–Day Challenge" memorandum. According to the Director, because of the "future orientation [of sales, Converse] will have a relatively clear picture of our FY'91 performance by October 1." *Id.* The Director stated, "In light of your subpar year in FY'90, if this year projects out to be another subpar year, I will be compelled to terminate you from the National Accounts team." *Id.*

According to Mr. McGovern, the standards set forth in the memorandum of September 21, 1990 were different from those in the "45–Day Challenge" memorandum. In the "45–Day Challenge" memorandum, Mr. McGovern was directed to make "definitive progress toward" the "acceptable minimum standards" but in the memorandum of September 21st, he was told he must "meet" the goals. *Testimony of William McGovern,* August 5, 1992. The Director of National Accounts testified that he had not changed the goal that Mr. McGovern had to achieve; in the estimation of the Director, Mr. McGovern had to "come very close" to the acceptable minimum levels set out in the "45–Day Challenge" memorandum. The Director acknowledged that it would be within his discretion to determine if Mr. McGovern had come close enough to those goals.

Mr. McGovern testified that he repeatedly attempted to communicate to his superiors the reasons why his accounts were not performing well. In a memorandum dated September 4, 1990, Mr. McGovern explained that the buyer for J.C. Penney was unhappy because Converse was distributing the "Magic" products to stores such as "Wards and Mervyn's." *Claimant's Exhibit* No. 6. According to Mr. McGovern, the J.C. Penney buyer "felt that Magic was an upscale product category" and should not be sold to these other accounts. *Id.; Testimony of William McGovern,* August 5, 1992. Mr. McGovern asserted that Converse's distribution policy had an overall negative effect on sales to J.C. Penney. Mr. McGovern also testified that he had told his superiors that Herman's was "in dire financial straits as a company." As a result, Herman's was using its limited funds to "go with the majors" such as Nike and Reebok. *Testimony of William Mc-*

*Govern,* August 5, 1992; *Claimant's Exhibit* No. 8. He asserted that he requested the Director of National Accounts to contact his accounts "as to [his] performance and as to how Converse is performing." *Id.* The Director testified that he did not contact Mr. McGovern's accounts because he did not feel he would receive any new information and Mr. McGovern's ineffectiveness resulted from his inability to work with other departments within Converse, rather than difficulties being experienced within the corporate accounts.

Mr. McGovern described the "at once" program as a program designed to "pick up some immediate business." For example, he "might have inventory available" which he could offer to his accounts "on an immediate basis." Mr. McGovern explained that his accounts could not take advantage of the at once programs because their funds "were tied up." The Director of National Accounts testified that all of the National Accounts operated primarily on a future order basis. Therefore, all the National Accounts Executives were under the same constraints when trying to solicit "at once" orders. However, according to the Director, Mr. McGovern's at once orders were lower than the other National Accounts Executives and were unacceptable.

In a memorandum from the Director dated October 1, 1990, Mr. McGovern was informed that he continued "to perform below the minimum standards of the National Accounts position." *Id.* "[F]or this reason ... a decision [would] be made no later than October 9, 1990 as to [his] continuing employment with Converse." *Id.* The Director attached a chart which outlined Mr. McGovern's plan goals and set forth estimates calculated by Director.

As of October 1, 1990, Mr. McGovern had completed an estimated 63.8% of his total plan goal: the total plan goal was $8.1 million and the Director estimated that Mr. McGovern had sold $5.1 million. *Claimant's Exhibit* No. 9. Mr. McGovern testified that as of October 1, 1990, he had achieved 150% of his plan goal for sales to Thom McAn and 82.4% of his plan goal for sales to his military account. *Testimony*

*of William McGovern,* August 5, 1992; *Claimant's Exhibit* No. 9. The Director of National Accounts testified that Thom McAn was a small account: the "plan volume" was only $200,000, compared to the $4.2 million plan volume for J.C. Penney. The Director testified military sales were at an acceptable level, although he noted that the actual military shipments for fiscal year 1991 were less than the estimates set out in the memorandum of October 1, 1990.

In the Director's memorandum of October 1, 1990, he estimated that Mr. McGovern would achieve 71.4% of his plan goal for J.C. Penney and 20% of his plan goal for Herman's. *Claimant's Exhibit* No. 9. According to the Director, he was "being generous" in calculating the estimates. *Testimony of Bill Adams,* August 6, 1992. He also testified that although the estimate for J.C. Penney was above the 70% level, it was below the acceptable minimum level for that account. *Id.* The Director explained that it was important for sales to J.C. Penney to be above 70% of plan goal because J.C. Penney was such an important account. *Id.*

On October 1, 1990, Mr. McGovern met with the Director and Mickey Bell, the Executive Vice President of Sales. Mr. McGovern requested the meeting, at which he reviewed the status of his accounts. The Director reiterated his concerns about sales to Herman's and J.C. Penneys and his perception of Mr. McGovern's "shortcomings." *Debtors' Exhibit* J. Mr. McGovern was again informed that the Director would make his final decision on October 9, 1990.

On October 9, 1990, the Director of National Accounts met with Mr. McGovern and informed him that because his "results [were] unacceptable," the Director had "decided to discharge [Mr. McGovern] from National Accounts, and ... there appears to be no other positions currently open." *Claimant's Exhibit* No. 12. Therefore, Mr. McGovern was "terminated from Converse." *Id.* The Director reviewed the reasons for his decision, citing the various memoranda and directives which had been given to Mr. McGovern. *Id.*

In support of his assertion that his performance was not inadequate, Mr. McGovern asserted that at the time of his termination, his percentage completion of his individual plan goal for fiscal year 1991 was as good as the percentage completion by the National Accounts division as a whole. The National Accounts division was comprised of all of the National Accounts, including those accounts assigned to Mr. McGovern. According to evidence presented by Claimant, as of October 1, 1990, the Director of National Accounts estimated that Mr. McGovern was achieving 63.8% of his individual plan goal for fiscal year 1991. *Claimant's Exhibit* No. 9. The National Accounts division as a whole actually completed 71.2% of the plan goal. *Claimant's Exhibit* No. 31.

The Director of National Accounts testified that the other National Accounts Executives performed better than Mr. McGovern. He asserted the other National Accounts Executives achieved the following sales for fiscal year 1991: DeSanctis— 75% of plan goal; Turco—149% of plan goal; Ford—88% of plan goal; and Dimke—98% of plan goal.[4]

### D. Age–related Comments

Mr. McGovern testified that in 1990, Mr. Adams, the Director of National Accounts, told him that he was a "negative influence on the younger guys in the department." *Testimony of William McGovern*, August 5, 1992. Mr. Adams testified that he did not use the phrase "negative influence." However, Mr. Adams recalled that he had told Mr. McGovern that he should "take more of a leadership role ... [and] be a positive influence around them." *Testimony of Bill Adams*, August 6, 1992. As Mr. McGovern was "the most experienced of the National Account group, certainly there was an inbred respect level and something that they were looking for him to be a leader." *Id.* Mr. Adams referred to Mr. McGovern as the "senior executive" and

explained that he meant "the most experienced National Account rep." *Id.* The Director testified that age played no part in his decision to terminate Mr. McGovern. *Id.*

### E. Post–Termination

Upon his departure from Converse, Mr. McGovern received severance pay in the amount of $24,000. *Stipulation of Facts,* p. 4. In April of 1991, Mr. McGovern took a lump sum payment from his 401(k) plan, known as the Thrift Savings Plan, in the amount of $65,010.31. *Id.* Mr. McGovern also received $7,140.00 in unemployment compensation.

In August of 1991, Mr. McGovern became a National Account Sales Manager at Reebok, a position with a base salary of $70,000. *Testimony of William McGovern*, August 5, 1992; *Stipulation of Facts*, p. 4. He testified this position is "almost exactly the same" as the National Account Executive position at Converse. According to his testimony at this trial, Mr. McGovern has exceeded his plan goal at Reebok, increased his accounts "significantly" and received a "first quarter bonus" in June of 1992.

Debtors asserted that after Mr. McGovern's termination, sales to Mr. McGovern's key account increased. According to the Director of National Accounts, Converse sales to J.C. Penney for fiscal year 1992 were $4.2 million and sales for fiscal year 1993, at the time of trial, were expected to exceed the plan goal.

### III. *Law on Age Discrimination*

The proceedings in this case have arisen out of Debtors' objection to the claims of William McGovern which were filed in compliance with 11 U.S.C. § 501 in these bankruptcy estates. Section 502 of Title 11 of the United States Code provides:

A claim or interest, proof of which is filed under section 501 of this title, is

---

**4.** The Director of National Accounts testified that DeSanctis handled the men's Foot Locker account; Turco handled the Anaconda, Oshman's and women's and children's Foot Locker accounts; Ford handled the Sears, Montgomery

Ward and Florsheim accounts and Dimke handled the Mervyns account and other key regional accounts. *Testimony of Bill Adams,* August 6, 1992.

deemed allowed, unless a party in interest ... objects.

11 U.S.C. § 502(a).

"A properly filed proof of claim is prima facie evidence of the amount and validity of the claim, and a debtor who objects must offer evidence in rebuttal." *In re Paige*, 106 B.R. 346, 349 (Bankr.D.Conn.1989); *see also In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y.1990). "If the objecting party rebuts the claimant's prima facie case, 'it is for the claimant to prove his claim, not for the objector to disprove it.'" *In re Kahn*, 114 B.R. at 44 (quoting *In re Gorgeous Blouse Co., Inc.*, 106 F.Supp. 465 (S.D.N.Y. 1952)).

This Court finds that the Debtors have rebutted the evidence based on the Claimant's properly filed proof of claim in the preliminary proceedings in connection with these objections to claims. The claims are as yet unliquidated, and the Debtors have denied liability. Thus, as this Court announced prior to trial, the burden shifted to the Claimant to establish his right to payment pursuant to the proof of claim. Accordingly, Claimant presented his case as a plaintiff would in this age discrimination claim, and Debtors responded as defendants. In the pleadings filed in connection with these claims and this claim objection, Mr. McGovern alleged that Debtors violated the Age Discrimination in Employment Act and the age discrimination provisions of the Massachusetts laws set forth at Mass.Gen.L. Ch. 151B, § 4.[5] Massachusetts courts have applied the same analysis to state and federal discrimination claims. Therefore, this Court will analyze these claims collectively. *White v. Univ. of Massachusetts at Boston*, 410 Mass. 553, 574 N.E.2d 356, 358 (1991); *see also Wheelock v. Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 355 N.E.2d 309, 313 (1976) (The Massachusetts Supreme Judicial Court analyzes 151B claims

pursuant to the burdens set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

The Age Discrimination in Employment Act ("ADEA") provides in pertinent part:

It shall be unlawful for an employer—

(1) ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ...

29 U.S.C. § 623(a)(1).

### A. Order of Proof

"The United States Supreme Court set forth guidelines to analyze discrimination claims [under the Civil Rights Act of 1964] in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1242 (8th Cir.1991). It is well settled that those guidelines are applicable to age discrimination cases brought under the ADEA. *Hall v. American Bakeries Co.*, 873 F.2d 1133, 1134 (8th Cir.1989) (citations omitted).

According to the *McDonnell Douglas* guidelines, "the burden of production rests first with the plaintiff to establish a prima facie case of discrimination." *Hall v. American Bakeries*, 873 F.2d at 1134. If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to show some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* At this point, the burden is only one of production; the ultimate burden of persuasion remains with the plaintiff to show that but for his age, he would not have been adversely affected by the employment decision. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1364 (7th Cir.1988) (citations omitted); *Phipps v. Gary Drilling Co., Inc.*, 722 F.Supp. 615,

---

**5.** The Massachusetts statute provides, in pertinent part:

It shall be an unlawful practice ...

1B. For an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such

individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

Mass.Gen.Laws Ann. Ch. 151B, § 4 (West 1992).

619 (E.D.Cal.1989). If the defendant shows a legitimate reason, then the burden shifts back to the plaintiff to show by a preponderance of the evidence "that the defendant's proffered reason was pretextual." *Hall v. American Bakeries*, 873 F.2d at 1134 (citing *McDonnell Douglas*, 411 U.S. at 802–804, 93 S.Ct. at 1824); *see also Mechnig v. Sears*, 864 F.2d at 1364.

## B. Prima Facie Case

"The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

As the United States Supreme Court noted in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* at 577, 98 S.Ct. at 2949.

In *McDonnell Douglas*, the Supreme Court outlined certain elements which a plaintiff might use to prove a prima facie case of discrimination. 411 U.S. at 802, 93 S.Ct. at 1824. However, the Court added "that this standard is not inflexible, as '[the] facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect in differing factual situations.'" *Burdine*, 450 U.S. at 253, n. 6, 101 S.Ct. at 1093, n. 6 (quoting *McDonnell Douglas*, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13).

■ As noted above, the *McDonnell Douglas* guidelines are applicable to age discrimination cases brought under the ADEA. *See Hall v. American Bakeries* at 1134. The Eighth Circuit has developed criteria which a plaintiff in an age discrimination action might use to establish a prima facie case. The courts in the Eighth Circuit have varied the criteria applicable to different factual situations. In particular, when the alleged discriminatory action involves a reduction in work force, the courts have added a fifth element, and required that a plaintiff establish that his age was a determining factor in the defendant's actions.[6] *See Johnson*, 931 F.2d at 1243.

■ In age discrimination cases which do not involve a reduction in work force, most courts in this Circuit rely on *Cova v. Coca–Cola Bottling Co.*, 574 F.2d 958, 959 (8th Cir.1978). In *Cova*, the Eighth Circuit Court of Appeals set out four elements which a plaintiff may use to establish a prima facie case of age discrimination. First, the plaintiff must show that he is within a protected age group. Under the ADEA, the protected age group includes individuals "who are at least 40 years of age." 29 U.S.C. § 631(a). The evidence shows that Mr. McGovern was 51 years old when he was discharged, thus establishing the first element of his prima facie case.

Second, under the *Cova* guidelines, the plaintiff must show that he "met applicable job qualifications." The Eighth Circuit Court of Appeals and district courts within the Eighth Circuit have, in some cases, modified this element to require a plaintiff to show that he was performing his job at a level that met the defendant's legitimate expectations. *See Hall v. American Bakeries* at 1135. In *Halsell v. Kimberly–Clark Corporation*, the Court of Appeals for the Eighth Circuit explained the need for the modification of the second element. 683 F.2d 285 (8th Cir.1982), cert. denied, 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d

6. Recently, this Court considered a reduction in work force situation in the age discrimination claims of another claimant, Richard Priest. *In re Interco*, 152 B.R. 273 (Bankr.E.D.Mo.). In that Memorandum, this Court outlined five factors that the Claimant must establish in order to prove a prima facie case of age discrimination in a reduction in work force case. *Id.* at 283–84. Those factors include: (1) that plaintiff was in a protected age group; (2) that he was performing his job at a level that met his employer's legitimate expectations; (3) that despite plaintiff's performance in his job, he was terminated; (4) that his job in its various parts continued to exist; and (5) that plaintiff's age was a determining factor in defendant's actions. *Id.* (citing *Hall v. American Bakeries Co.*, 873 F.2d 1133, 1135 (8th Cir.1989)).

438 (1983). The Eighth Circuit noted that the *McDonnell–Douglas* guidelines stemmed from an alleged discriminatory hiring case. Following an opinion from the First Circuit Court of Appeals, the Eighth Circuit explained that "[b]ecause the complaint [in the Eighth Circuit case] stemmed from firing rather than hiring, the court modified the four factors in order to produce an analogous inference [of unlawful discrimination.]" *Halsell*, 683 F.2d at 290. Thus, the Eighth Circuit held in *Halsell* that "[i]n considering whether [plaintiff] has produced sufficient evidence to support such an inference, this court must determine whether [plaintiff] showed that he was qualified for the job in the sense that his performance met [the employer's] legitimate expectations." *Id.* at 290. Since *Halsell*, some courts in this Circuit have continued to use the *Cova* articulation of the second element, while other courts have modified the second element to include the explanation propounded in *Halsell.*

■ In this case which stems from a firing, the second element is closely connected to Debtors' defense: that Mr. McGovern was not performing satisfactorily. At this trial Mr. McGovern testified that he was performing at the same level as other National Accounts Executives. He also testified that although he did not achieve 100% of all his sales goals, "[t]heoretically, a salesman could fail to reach his sales goals and still be performing satisfactorily." *Claimant's Amended Trial Brief,* filed June 2, 1992, p. 4 (citing *Claimant's Exhibit* No. 39). This Court finds and concludes that, considering only the Claimant's case in chief, the evidence and testimony presented by Mr. McGovern is sufficient to satisfy the second element. *See Halsell v. Kimberly–Clark,* 683 F.2d at 290 (acknowledging that "the Supreme Court stated in *Burdine* that '[t]he burden of establishing a prima facie case of disparate treatment is not onerous[.]'" (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093)).

The third element set out in *Cova* provides that the Plaintiff must establish that despite his performance, he was terminated. Mr. McGovern established the third element because he was discharged on October 9, 1990.

The fourth element in *Cova* requires the plaintiff to prove that after the discharge, the position remained open and the employer continued to seek applications from persons with similar qualifications. In *Halsell v. Kimberly–Clark,* the Eighth Circuit noted that in a case which stemmed from firing rather than hiring, this element might be adapted to require the plaintiff to prove that the employer "sought someone to perform the same work after he left." 683 F.2d at 290 (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1013–1014 (1979)). In this case, Mr. McGovern established that other National Accounts Executives continued to handle Mr. McGovern's accounts, thus satisfying the fourth element.

This Court finds that the evidence offered by Claimant in establishing the four elements of his prima facie case, is sufficient to establish a prima facie case of age discrimination, thus requiring Debtors to go forward with the defense of this action.

## C. Legitimate Nondiscriminatory Reasons for Discharge

■ Debtors have argued that Mr. McGovern was discharged because he failed to meet the legitimate expectations of Converse in that his sales figures were not satisfactory. Debtors proved that Mr. McGovern failed to achieve his plan goal for fiscal year 1990. According to the evidence presented at this trial, Mr. McGovern achieved only 40.2% of his plan goal for that year. Debtors also proved that as early as October of 1989, the Director of National Accounts advised Mr. McGovern that he was unhappy with his performance. In particular, the Director asserted that the marketing department was in a state of transition; thus it was Mr. McGovern's responsibility to "seek out resources to assist [him] in developing an integrated sales and marketing program for [his] accounts." *Claimant's Exhibit* No. 2. In fiscal year 1991, Mr. McGovern's plan goal was reduced from $11.2 million to $8.1 million. Despite this reduction, Mr. McGovern did not achieve his plan goal. In addition, in

fiscal year 1991, actual sales to Mr. McGovern's key account, J.C. Penney, declined. The Director of National Accounts testified that he was dissatisfied with Mr. McGovern's sales performance. In the Director's opinion, Mr. McGovern's sales declined because Mr. McGovern failed to coordinate with the marketing and product development departments within Converse and failed to develop creative strategies to place Converse's products with the accounts. The Director of National Accounts continued to be displeased with Mr. McGovern's performance in fiscal year 1991. During that year, Mr. McGovern received several memoranda from the Director of National Accounts. In these memoranda and in meetings with Mr. McGovern, the Director continually asserted that Mr. McGovern was not achieving adequate sales and would not achieve his plan goal for fiscal year 1991 unless his sales increased. In July of fiscal year 1991, the Director set "acceptable minimum levels" of sales for two of Mr. McGovern's accounts and set out a 45–day deadline. These were not new quotas, but were based on the Director's calculation of the amount of sales Mr. McGovern would need to make in order to achieve 70% of the combined plan goals for those two accounts. He set the 45–day deadline to coincide with the last day to place future orders to assure shipment within fiscal year 1991.

Mr. McGovern did not achieve the "acceptable minimum levels" set forth by the Director of National Accounts. The acceptable minimum level for J.C. Penney was $3.4 million; Mr. McGovern achieved estimated sales of $2.75 million. *Debtors' Exhibit E, p. 3.* The acceptable minimum level for Herman's was $800,000; Mr. McGovern achieved estimated sales of $160,000. *Id.* The combined acceptable minimum levels amounted to $4.2 million; Mr. McGovern achieved estimated sales of $2.91 million. *Id.*

As part of his decision to terminate Mr. McGovern, the Director of National Accounts estimated the total sales to Mr. McGovern's accounts. According to those estimates, Mr. McGovern would have achieved about 63% of his total plan goal for fiscal year 1991.[7] This level of sales was not acceptable to the Director of National Accounts. Further, the Director had determined that Mr. McGovern was not taking the appropriate measures to achieve acceptable sales. In particular, the Director repeatedly asserted that it was Mr. McGovern's failure to become involved with marketing and product development which caused his inadequate sales.

The Director of National Accounts terminated Mr. McGovern because his sales for fiscal years 1990 and 1991 were inadequate. The Director did not believe that Mr. McGovern would achieve greater sales in the future, because Mr. McGovern was not heeding the advice of the Director regarding his sales strategy. This Court finds that Debtors have articulated a legitimate nondiscriminatory reason for discharging Mr. McGovern.

"This Court does not sit as a super-personnel department that reexamines an entity's business decisions." *Mechnig v. Sears,* 864 F.2d at 1365 (quoting *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)). Nor was the ADEA "intended as a vehicle for the general judicial review of business decisions." *Phipps v. Gary Drilling,* 722 F.Supp. at 620. Therefore, this Court "will not re-evaluate business decisions made in good faith, even though they have some negative impact on age-protected individuals, and will not 'second guess' an employer's business judgments in an effort to find some possible violation of the Act." *Id.* (citation omitted).

---

7. The Director of National Accounts testified that Mr. McGovern's actual "final percentage of plan" for fiscal year 1991 was "42% of plan." He asserted the actual final sales for J.C. Penney were $1.9 million against a plan goal of $4.2 million. The actual final sales for Herman's were $147,000 against a plan goal of $2 million.

These year-end figures were not available at the time Mr. McGovern was discharged, and were not the figures the Director of National Accounts used when making his decision. This Court has used the figures and estimates available at the time Mr. McGovern was discharged.

This Court finds that the reasons articulated by Converse for discharging Mr. McGovern fall within the ambit of reasonable business judgments and decisions. It is not unreasonable for the employer to try to stem declining sales by terminating a sales person whose sales did not reach 70% of plan goal for two consecutive years and whose sales were in a declining mode.

### D. Pretext

█ Mr. McGovern argues that he was singled out for discharge, although his sales were no worse than the National Accounts Team as a whole. He contends that "Converse footwear products were performing poorly and there was little or nothing the National Accounts Executives could do about it at the time." Mr. McGovern testified at this trial that Converse sales declined because Converse's canvas products were undesirable to his accounts and other athletic footwear companies were rapidly gaining market share. Mr. McGovern asserts that the Director of National Accounts did not take into account these factors which were beyond Mr. McGovern's control.

The evidence adduced at trial shows that the National Accounts team as a whole completed 71.2% of plan goal for fiscal year 1991. However, when examined individually, the evidence shows that the other National Accounts Executives completed the following percentages: 75% of plan goal; 149% of plan goal; 88% of plan goal; and 98% of plan goal. At the time Mr. McGovern was discharged, the Director estimated he would complete only 63.8% of his plan goal. Thus, Mr. McGovern was not performing at the same level as the other National Accounts Executives.

The Director of National Accounts testified that he did take into account the adverse economic and business climate in which Converse was operating. According to the Director, these factors were built into the plan goals set at the beginning of the fiscal year.

Claimant has argued that it was unreasonable to expect him to compensate for the shortcomings in Converse's marketing and product development divisions. However, if the products being offered by Converse were undesirable to the National Accounts, and if Converse was providing inadequate advertising and marketing support, all of the National Accounts Executives were laboring under the same conditions. The other National Accounts Executives performed adequately under these conditions, but Mr. McGovern's sales were not adequate.

During fiscal years 1990 and 1991, sales to the National Accounts declined. The Director of National Accounts chose to deal with declining sales by requesting Mr. McGovern to become more involved with product development and marketing. "Although an employer may not make unreasonable expectations, and must make the employee aware of just what his expectations are, beyond that the court will not inquire into the defendant's method of conducting its business." *Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir.1983) (quoting *Kephart v. Inst. of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir.1980)).

This Court finds that the requests and demands made by Converse were not unreasonable. This Court also finds that Claimant was aware of the employer's expectations. This Court finds that Converse did not change the standards or goals which Converse expected Mr. McGovern to achieve. Even if it was unwise for Converse to expect Mr. McGovern to become more involved with product development and marketing, it is not for this Court to judge the wisdom of an employer's business judgments. *Phipps v. Gary Drilling*, 722 F.Supp. at 620.

█ At this trial, Mr. McGovern testified that the Director of National Accounts told him that he was a "negative influence on the younger guys in the department." *Testimony of William McGovern*, August 5, 1992. The Director of National Accounts denied making this statement; he recalled that he had told Mr. McGovern to "take more of a leadership role ... [and] be a positive influence around them." *Testimony of Bill Adams*, August 6, 1992.

" '[I]solated remarks have been rejected by courts as insufficient in establishing an inference of age discrimination' even when made directly to a claimant." *Tighe v. All Brand Importers, Inc.,* 814 F.Supp. 237, 241 (D.Conn.1992) (quoting *Graham v. Renbrook School,* 692 F.Supp. 102, 108 (D.Conn.1988)). This Court finds that even if this isolated comment was made, it is insufficient to show pretext. *See Guthrie v. Tifco Indus.,* 941 F.2d 374, 378–79 (5th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992).

As noted above, this Court finds that the reasons espoused by Debtors constitute legitimate business reasons for Mr. McGovern's termination. This Court further finds that Claimant has not presented evidence to show that the proffered reasons are pretextual, and that the decisions made by the Director of National Accounts were made in good faith and not as a pretext to conceal the termination of an age-protected individual. *See Phipps v. Gary Drilling,* 722 F.Supp. at 620.

## IV. *Conclusion*

In conclusion, this Court finds that Debtors presented sufficient evidence to prove that Converse discharged Mr. McGovern for legitimate business reasons, and that Mr. McGovern did not prove that the proffered reasons were pretextual, or that age was a factor in Mr. McGovern's discharge. This Court further finds that Converse did not violate the Age Discrimination in Employment Act or the Massachusetts statute regarding age discrimination in employment. Therefore, Debtors' objection to the claims of William McGovern will be sustained and the claims not allowed.

## ORDER

At Saint Louis, in this District, this 7th day of May, 1993.

On consideration of the record as a whole, and consistent with the Memorandum entered in this matter,

**IT IS ORDERED** that this matter is concluded; and

(A) That the motion of William McGovern ("Claimant") to admit a life expectancy table (Motion Z–157) is **GRANTED** and the life expectancy table is admitted as Claimant's Exhibit No. 42; and

(B) That the Debtors' objections to the claims of William McGovern, numbered 2782 and 6058 are **SUSTAINED;** and that said claims are **NOT ALLOWED** in these bankruptcy cases.